IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|    and | ) | |
| FLORIDA DEPARTMENT OF | ) | |
| ENVIRONMENTAL PROTECTION, | ) | |
| | ) | |
|              Plaintiffs, | ) | Civil Action No. 8:15-cv-02286-JDW-TBM |
|     v. | ) | |
| | ) | |
| MOSAIC FERTILIZER, LLC, | ) | |
| | ) | |
|              Defendant. | ) | |

**CONSENT DECREE**

# TABLE OF CONTENTS

I.      Jurisdiction and Venue ……………………………………………………………….. 5

II.     Applicability …………………………………………………………………… 6

III.    Definitions ………………………………………………………………………….8

IV.     Civil Penalty …………………………………………………………………… 18

V.      Compliance Requirements ……………………………………………………….. 20

VI.     Work Takeover ……………………………………………………………… 41

VII.    Supplemental Environmental Project  …………………………………………… 43

VIII.   Reporting Requirements ………………………………………………………… 45

IX.     Stipulated Penalties ……………………………………………………………… 49

X.      Force Majeure …………………………………………………………………… 52

XI.     Dispute Resolution ………………………………………………………………... 55

XII.    Information Collection and Retention …………………………………………… 58

XIII.   Effect of Settlement/Reservation of Rights …………………………………… 61

XIV.    Costs …………………………………………………………………………….64

XV.     Notices …………………………………………………………………………… 65

XVI.    Effective Date …………………………………………………………………… 67

XVII.   Retention of Jurisdiction ……………………………………………………….. 68

XVIII.  Modification …………………………………………………………………… 68

XIX.    Termination ……………………………………………………………………… 69

XX.     Public Participation …………………………………………………………….. 72

XXI.    Signatories/Service …………………………………………………………… 73

XXII.   Integration ……………………………………………………………………… 73

XXIII.  Final Judgment ………………………………………………………………… 74

XXIV.   Appendices ……………………………………………………………………... 74

    **WHEREAS**, Plaintiffs, the United States of America (United States), on behalf of the

United States Environmental Protection Agency (EPA), and the Florida Department of

Environmental Protection (FDEP), which is the agency of the State of Florida to which the

Florida Legislature has delegated the exclusive power and duty to enforce Chapter 403, Florida

Statutes, including the authority to bring actions in courts of competent jurisdiction for violations

of the Florida Resource Recovery and Management Act pursuant to §§ 403.121, 403.131,

403.161, 403.708, and 403.727(2), Florida Statutes (together the Plaintiffs), have filed a

complaint alleging that Defendant Mosaic Fertilizer, LLC (Mosaic) has violated the Resource

Conservation and Recovery Act (RCRA), 42 United States Code (U.S.C.) § 6901 et seq., and the

Florida Resource Recovery and Management Act, § 403.702 et seq., Florida Statutes (F.S.), and

the applicable regulations in 40 C.F.R. Parts 260-270, and in Chapter 62-730, Florida

Administrative Code (F.A.C.) at its sulfuric acid, phosphoric acid and fertilizer manufacturing

facilities located in Florida as identified in the Complaint (Facilities);

    **WHEREAS**, the Complaint includes allegations that Mosaic failed to characterize and

illegally treated, stored and disposed of hazardous wastes from various processes at its Facilities,

including: the production of sulfuric acid, diammonium phosphate (DAP) and monoammonium

phosphate (MAP) fertilizer, and fluorosilicic acid (FSA); wastes generated during cleaning of the

phosphoric acid plant and fertilizer plant equipment; and wastewaters generated from the

scrubbers used to control air pollution from the phosphoric acid plants and from other chemical

and waste management processes at its Facilities without a RCRA permit or interim

status.  The Complaint also alleges that Mosaic illegally placed hazardous wastes in a

Phosphogypsum Stack System dedicated for managing phosphoric acid production wastes

exempt from hazardous waste regulation pursuant to the Bevill Exemption, 40 C.F.R.

– 3 –

§ 261.4(b)(7), thus violating Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924-25, and the applicable regulations in 40 C.F.R. Parts 260-270, and Sections 403.721 and 403.722, F.S, and the applicable regulations in Chapter 62-730, F.A.C., and that those hazardous wastes remain in the Phosphogypsum Stack System;

**WHEREAS**, Mosaic denies the applicability of Subtitle C of RCRA and the regulations promulgated thereunder to certain practices at the Mosaic Facilities that are the subject of the Complaint, denies the violations alleged in the Complaint, and maintains that it has been and remains in compliance with RCRA and is not liable for civil penalties or injunctive relief;

**WHEREAS**, the objective of the Parties in this Consent Decree is to resolve the civil claims alleged in the Complaint by 1) establishing certain injunctive relief and environmental projects, whereby Mosaic shall modify certain operating practices with respect to its management of hazardous wastes and Bevill-Exempt Wastes, implement environmental controls, remediation, and financial assurance, and undertake certain pollution reduction and other beneficial projects; and 2) assessing an appropriate penalty;

**WHEREAS,** Mosaic has conducted itself in good faith in its discussions with the Plaintiffs concerning the violations alleged in the Complaint, and has already implemented certain operational changes at its Facilities and remedial measures, obviating the need for certain injunctive relief;

**WHEREAS**, by agreeing to entry of this Consent Decree, Mosaic makes no admission of law or fact with respect to the allegations in the Complaint, and continues to deny any non-compliance or violation of any law or regulation identified therein or in this Consent Decree.  For the purpose of avoiding litigation among the Parties, however, Mosaic and where

– 4 –

applicable its parent company, The Mosaic Company, agree to the requirements of this Consent Decree;

**WHEREAS**, the Parties agree that the United States' filing of the Complaint and entry into this Consent Decree constitute diligent prosecution by the United States and FDEP, under Section 7002(b)(1)(B) of RCRA, 42 U.S.C. § 6972(b)(1)(B), of all matters alleged in the Complaint and addressed by this Consent Decree through the date of lodging of this Consent Decree; and

**WHEREAS**, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE**, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), below, and with the consent of the Parties,

**IT IS HEREBY ADJUDGED, ORDERED, AND DECREED** as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and over the Parties, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1331, 1332, 1345, 1355 and 1367.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1331, 1332, 1345, 1355, 1367, 1391(b) and (c), and 1395(a), and Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), because Mosaic's Facilities are located in this judicial district.  For purposes of this Consent Decree, or any action to enforce this Consent Decree, the Parties consent to the Court's jurisdiction over this Consent Decree and any such action and over Mosaic and The Mosaic Company, and further consent to venue in this judicial district.

2.      Pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2), notice of the commencement of this action has been given to FDEP.

3.      For purposes of this Consent Decree only, Mosaic agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924 and 6925, and Sections 403.721, 403.722, and 403.727, F.S.

## II.  APPLICABILITY

4.      The obligations of this Consent Decree apply to and are binding upon the United States, FDEP, Mosaic, and, as provided herein, The Mosaic Company, and any successors, assigns, or other entities or persons otherwise bound by law.  Rights granted to EPA under this Consent Decree may be exercised by FDEP upon the written agreement of EPA and FDEP with notice to Mosaic.  Nothing in this Consent Decree shall apply to administrative or enforcement proceedings other than this action or an action to enforce this Consent Decree.  Nor does anything in this Consent Decree relieve Mosaic of its obligation to comply with any federal and state laws applicable to activities that are not within the definition of Work in this Consent Decree.

5.      No transfer of ownership or operation of all or a portion of a Facility subject to the obligations of this Consent Decree, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Mosaic of its obligation to ensure that the terms of this Consent Decree are implemented, unless: (1) the transferee agrees in writing to undertake the obligations required by this Consent Decree and to be substituted for Mosaic as a Party to the Consent Decree and thus be bound by the terms thereof; and (2) the United States, after consultation with FDEP, consents in writing to relieve Mosaic and the Mosaic Company of their respective obligations under this Consent Decree pursuant to Section XVIII of this Consent

Decree (Modification).  At least thirty (30) Days prior to a proposed transfer of any or all of Mosaic's obligations under this Consent Decree , or such other period agreed to by the Parties in writing: (i) Mosaic shall provide a copy of this Consent Decree to the proposed transferee, if not previously provided; and (ii) shall provide written notice of the prospective transfer, together with a copy of the proposed written agreement (subject to Paragraphs 88 and 89 of this Consent Decree and as may otherwise be agreed in writing) transferring obligations to the transferee, to EPA, FDEP, the United States Attorney for the Middle District of Florida, and the United States Department of Justice, in accordance with Section XV (Notices) of this Consent Decree, together with a request for approval.  The United States' decision whether to approve the transferee's substitution for Mosaic under this Consent Decree, and what conditions may attend approval, will take into account:  (i) the status of the projects in Appendix 6 (RCRA Compliance Schedule), (ii) whether the transferee has or will have prior to the transfer the financial and technical capability to comply with this Consent Decree, (iii) and other factors that may be deemed relevant, including but not limited to the environmental compliance history of the proposed transferee and environmental management capabilities of the proposed transferee. As set forth in Appendix 2, Paragraph 36, any such transfer will not include the Financial Assurance obligations specified for Mosaic therein, and therefore will include Financial Assurance conditions appropriate to the transferee.  Any transfer of ownership or operation of all or a portion of the Facility without complying with this Paragraph constitutes a violation of this Consent Decree.  The United States' refusal to approve, or approval with conditions for, the substitution of the transferee for Mosaic under this Consent Decree shall be subject to dispute resolution pursuant to Section XI (Dispute Resolution) of this Consent Decree, but any judicial review shall be conducted pursuant to Paragraph 70(a) of this Consent Decree.  If Mosaic does

not prevail in such judicial review, Mosaic shall pay all costs incurred by the United States in connection with such judicial review, including attorney's fees.

6.      Mosaic shall: (1) provide a copy of this Consent Decree to its President/CEO, Executive Vice Presidents, Senior Environmental Counsel, and the General Manager, Environmental Manager, and Maintenance Manager of each Facility, and shall ensure that any employees and contractors whose duties might reasonably include compliance with any provision of this Consent Decree are made aware of this Consent Decree and specifically aware of the requirements of this Consent Decree that fall within such person's duties; (2) place an electronic version of the Consent Decree on its internal environmental website; and (3) post notice of lodging of the Consent Decree and its availability in a location at each Facility where legal notices are posted.  Mosaic shall be responsible for ensuring that all employees and contractors involved in performing any Work pursuant to this Consent Decree perform such Work in compliance with the requirements of this Consent Decree.

7.      In any action to enforce this Consent Decree, Mosaic shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

8.      Every term expressly defined by this Section shall have the meaning given that term herein, regardless of whether it is elsewhere defined in federal or state law.  Every other term used in this Consent Decree that is also a term used under RCRA, as amended, 42 U.S.C. §§ 6901 et seq., its implementing regulations, or the Florida Resource Recovery and Management Act, Sections 403.702 et seq., F.S., and Chapter 62-780, F.A.C., shall have the same meaning in this Consent Decree as such term has under RCRA or under federal or state

– 8 –

regulations.  In the case of a conflict between federal and state definitions, federal definitions shall control.  For purposes of this Consent Decree, whenever terms defined below or in Appendices 1-9 hereto are used in this Consent Decree, such definitions shall apply:

a.      Animal Feed Ingredient Production (AFIP) is the production of calcium phosphate animal feed product ingredients from the reaction of First Saleable Product, phosphate rock, limestone, and/or soda ash which takes place in the area(s) of the New Wales Facility identified in the Facility Report for that Facility;

b.      Bevill-Exempt Wastes shall mean Phosphogypsum and Process Wastewater from phosphoric acid production through mineral processing, which are solid wastes excluded from hazardous waste regulation pursuant to 40 C.F.R. § 261.4(b)(7)(ii)(D) and (P);

c.      Big Holding Tank (BHT) shall mean the tank(s) that Mosaic will install as compliance projects and that are designated as Big Holding Tank(s) in a Facility's Facility Report;

d.      BHT Effluent shall mean the output solution consisting of any or all of the inputs to the BHT that are described in the Facility's Facility Report;

e.      BHT Recovery Units comprise the BHT and those units in Downstream Operations from which, as set forth in a Facility's Facility Report, cleaning wastes and other materials will be circulated to the BHT for recovery in Upstream Operations or reuse as a cleaning solution following completion of the relevant compliance projects;

f.      Closing Facilities shall mean the Green Bay and South Pierce Facilities.

g.      Complaint shall mean the complaint filed by the United States and FDEP in this action;

– 9 –

h.      Consent Decree shall mean this Consent Decree and all Appendices identified in

Section XXIV (Appendices) and attached hereto. In the event of any conflict between this

Consent Decree and any Appendix hereto, this Consent Decree shall control;

i.      Corrective Action Work

shall mean 1) the activities described in Paragraphs 17 - 19 of Appendix 1, Attachment A;  2) the

activities described in Section I.D of Appendix 1, Attachment B; and/or 3) other activities taken

at the express direction of EPA or FDEP pursuant to their respective legal authorities to address a

release of:

a) the following products, including intermediates and wastes: phosphoric acid,

sulfuric acid, and FSA;

b) the following cleaning solutions, including entrained wastes and solids: SACS,

PACS, and FSACS;

c) Process Wastewater, including mixtures and entrained wastes and solids;

d) Phosphogypsum Stack System Wastewater, including mixtures and entrained

wastes and solids;

e) BHT Effluent or GHT Effluent, including entrained wastes and solids

when such releases occur: a) within AFIP, Upstream Operations,  Downstream Operations, or the

Process Wastewater RO Plants; b) from Mixed-Use, Grandfathered, or Recovery Units; or

c) from the Phosphogypsum Stack System, as identified in a Facility's Facility Report.

Corrective Action Work does not include other activities to be taken at the direction of EPA or

FDEP pursuant to their residual authorities to address other releases of hazardous waste and/or

hazardous constituents that may affect human health and the environment, which directions and

– 10 –

activities will be undertaken outside of, and will not be subject to, this Consent Decree ("Non-CD Corrective Action");

j.      DAP shall mean diammonium phosphate, which is manufactured in Granulation;

k.      Day shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State of Florida holiday, the period shall run until the close of business of the next business day;

l.      Defendant or Mosaic shall mean Mosaic Fertilizer, LLC.  Mosaic's parent company, The Mosaic Company, shall be referred to by its full corporate name;

m.      Downstream Operations shall mean all Facility operations involving the storage, management, transport, treatment, disposal or further processing of the First Saleable Product, manufacturing operations that use the First Saleable Product as a feedstock, and fluorosilicic acid (FSA) production operations, unless designated as a Mixed-Use Unit, Grandfathered Unit, or units in AFIP in that Facility's Facility Report;

n.      EPA shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

o.      Effective Date is defined in Section XVI (Effective Date);

p.      Facility or Facilities shall mean any one or more of Mosaic's Florida operations at the following locations: Bartow, Riverview, Green Bay, South Pierce, and New Wales, which include manufacturing plants, Phosphogypsum Stack Systems, and such other contiguous or adjacent property owned and/or operated by Mosaic, as delineated in Appendix 3, Site Maps. This does not include the former CF Industries, Inc. facilities at Plant City and Bartow, Florida.

For the purposes of Section XIII (Effect of Settlement/Reservation of Rights), Facilities also shall include the former Mulberry Phosphate Fertilizer facility located at Mulberry, Florida.

q.      Facility Reports shall mean the reports dated September 8, 2015, and attached hereto collectively as Appendix 4, prepared by EPA following inspections of Mosaic's Bartow, Riverview, and New Wales Facilities, which identify each Facility's Upstream, and Downstream Operations, its Mixed-Use Units, Recovery Units, and Grandfathered Units, compliance projects, and proposed future installations, and for the New Wales Facility AFIP area(s);

r.      FDEP shall mean the State of Florida Department of Environmental Protection and any of its successor departments or agencies;

s.      Financial Assurance shall mean financial assurance for the benefit of EPA and FDEP in order to ensure coverage for Third-party Liability, Phosphogypsum Stack System Closure and Long Term Care, as set forth in Appendix 2 (Financial Assurance) of this Consent Decree;

t.      First Saleable Product shall mean:

1)  Merchant Grade Acid (MGA), whether or not it is actually placed into commerce; or, if applicable,

2)  any intermediate phosphoric acid product with a $P_2O_5$ content less than or equal to MGA that is diverted from further processing into MGA in order to be placed into commerce, further concentrated above 54% $P_2O_5$ (by weight), or used as a feedstock in manufacturing MAP/DAP, Superphosphoric Acid (SPA), Purified Acid, or other chemical manufacturing products;

u.      Florida Phosphogypsum Rules shall mean Sections 376.30701, 403.087, 403.0876, 403.088, 403.0885, 403.121, 403.4154, and 403.4155, F.S.; and the rules promulgated

– 12 –

thereunder in Chapters 62-4, 62-520, 62-620, 62-672, 62-673, 62-777 and 62-780, F.A.C., as they may be amended (including any guidance materials incorporated therein), pertaining to the operation and closure of phosphoric acid facilities within the State, including any alternative measures approved in writing by FDEP according to the terms of F.A.C. 62-673.310 (Alternative Procedures and Requirements);

v.      FSA shall mean fluorosilicic acid ($H_2SiF_6$);

w.      FSA Cleaning Solution (FSACS) shall mean a solution of FSA or wastewater from FSA production (excluding waste solids not entrained in cleaning solutions but instead mechanically removed from FSA production, such as filtration residue, tank bottoms, and Swift Tower clean-out residue) with Non-Hazardous Aqueous Cleaning Solution (NHACS), Phosphogypsum Stack System Wastewater, and/or Process Wastewater used for cleaning pipes, tanks or other equipment;

x.      Granular Holding Tank (GHT) shall mean the tank(s) that Mosaic will install as compliance projects and that are designated as Granular Holding Tank(s) in a Facility's Facility Report;

y.      GHT Effluent shall mean the output solution consisting of any or all of the inputs to the GHT that are described in the Facility's Facility Report;

z.      GHT Recovery Units comprise the GHT and those units in Granulation from which, as set forth in a Facility's Facility Report, cleaning wastes and other materials will be circulated to the GHT for recovery or reuse as a cleaning solution following completion of the relevant compliance projects;

aa.     Grandfathered Unit shall mean a pipe, tank and/or other production, storage, or transportation unit in Downstream Operations specifically identified in a Facility's Facility Report as not feasibly segregable from Upstream Operations;

bb.     Granulation shall mean the process of converting liquid phosphoric acid, ammonia, secondary nutrients, and/or micronutrients into solid ammonium phosphate fertilizer in Downstream Operations;

cc.     Interest shall mean the interest rate specified in 28 U.S.C. § 1961;

dd.     MAP shall mean monoammonium phosphate, which is manufactured in Granulation;

ee.     Merchant Grade Acid (MGA) shall mean phosphoric acid that is typically 52% to 54% (by weight) of $P_2O_5$ but may vary slightly across the phosphoric acid industry, manufactured from the direct reaction of phosphate rock and sulfuric acid and containing less than one percent (1%) solids content;

ff.     Mixed-Use Unit shall mean a pollution control device, pipe, tank and/or other production, storage, or transportation unit specifically identified in a Facility's Facility Report as serving both Upstream Operations and Downstream Operations or serving both AFIP and Downstream Operations (and at New Wales also serving Upstream Operations);

gg.     Non-Hazardous Aqueous Cleaning Solution (NHACS) shall mean an aqueous solution, including without limitation fresh water, non-hazardous condensate, non-hazardous recycled water, and non-hazardous recovered groundwater, used for cleaning pipes, tanks or other equipment that, if evaluated as a solid waste before use, is not a RCRA listed or characteristic hazardous waste as defined by 40 CFR, Part 261, Subparts C and D;

hh.     Operating Facilities shall mean the Bartow, New Wales, and Riverview Facilities.

– 14 –

ii.      Paragraph shall mean a portion of this Consent Decree identified by an arabic numeral;

jj.      Parties shall mean the United States, FDEP, Mosaic and, where applicable, The Mosaic Company;

kk.      Phosphogypsum shall mean calcium sulfate and byproducts produced by the reaction of sulfuric acid with phosphate rock to produce phosphoric acid.  Phosphogypsum is a solid waste within the definition of Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), and Section 403.703(32) F.S.;

ll.      Phosphogypsum Stack shall mean any defined geographic area associated with a phosphoric acid production plant in which Phosphogypsum is disposed of or stored, other than within a fully enclosed building, container or tank;

mm.      Phosphogypsum Stack System shall mean the defined geographic area associated with a phosphoric acid production facility in which Phosphogypsum and Process Wastewater is disposed of or stored, together with all pumps, piping, ditches, drainage, conveyances, water control structures, collection pools, cooling ponds (including former cooling ponds that have been converted to lime treatment sludge ponds), surge ponds, auxiliary holding ponds, and regional holding ponds, and any other collection or conveyance system associated with the transport of Phosphogypsum from the phosphoric acid plant to the Phosphogypsum Stack, its management at the stack, and the Process Wastewater return to phosphoric acid production.  This definition includes toe drain systems and ditches and other leachate collection systems, but does not include conveyances within the confines of the phosphoric acid or fertilizer production plant(s) or emergency diversion impoundments used in emergency circumstances

– 15 –

caused by rainfall events of high volume or duration for the temporary storage of Process Wastewater to avoid discharges to surface waters of the state;

nn.     Phosphogypsum Stack System Wastewater shall mean waste water in the Phosphogypsum Stack System containing Bevill-Exempt Wastes commingled with hazardous wastes as alleged in the Complaint;

oo.     Phosphoric Acid Cleaning Solution (PACS) shall mean a solution of phosphoric acid (generated from an operation in which at least 50 percent of the feedstock in a calendar year was from ores or minerals or beneficiated ores or minerals) and NHACS, Phosphogypsum Stack System Wastewater, and/or Process Wastewater used for cleaning pipes, tanks or other equipment;

pp.     Process Wastewater shall mean process wastewater from phosphoric acid production.  The following wastestreams constitute process wastewater from phosphoric acid production: water from phosphoric acid production operations through concentration to the First Saleable Product; process wastewater generated from Upstream Operations that is used to transport Phosphogypsum to the Phosphogypsum Stack; Phosphogypsum Stack runoff (excluding non-contact runoff); process wastewater generated from any uranium recovery in phosphoric acid production; process wastewater generated from non-ammoniated animal feed production (including defluorination, but excluding ammoniated animal feed production) operations that qualify as mineral processing operations based on the definition of mineral processing that EPA finalized on September 1, 1989; and process wastewater generated from a superphosphate production process that involves the direct reaction of phosphate rock with dilute phosphoric acid with a concentration less than Merchant Grade Acid [see 55 Fed. Reg. 2328, January 23, 1990];

qq.    Purified Phosphoric Acid (PPA) shall mean a refined grade of phosphoric acid where contaminants have been removed from wet-process phosphoric acid through solvent extraction, chemical precipitation, filtration, or other purification processes to produce a purified phosphoric acid product suitable for food grade or other higher purity phosphoric acid applications (as of the date of lodging of this Consent Decree, Mosaic does not manufacture Purified Phosphoric Acid);

rr.    RCRA Requirements shall mean the requirements of RCRA Subtitle C, the applicable regulations in 40 C.F.R. Parts 260-270, and Sections 403.721 and 403.722, F.S, and the applicable regulations in Chapter 62-730, F.A.C.

ss.    RCRA Section 3013 Orders shall mean the administrative orders on consent with docket numbers RCRA-04-2006-4252 (Green Bay); RCRA-04-2006-4253 (Bartow); RCRA-04-2010-4252 (Riverview); RCRA-04-2011-4253 (South Pierce); and RCRA-04-2011-4252 (New Wales);

tt.    Recovery Units shall mean both BHT Recovery Units and GHT Recovery Units;

uu.    Section shall mean a portion of this Consent Decree identified by a roman numeral;

vv.    Sulfuric Acid Cleaning Solution (SACS) shall mean a solution of sulfuric acid and NHACS, Phosphogypsum Stack System Wastewater, and/or Process Wastewater used for cleaning pipes, tanks or other equipment;

ww.    Superphosphoric Acid (SPA) shall mean liquid phosphoric acid (not a solid phosphate product such as granulated triple superphosphoric acid) generally with a $P_2O_5$ content greater than MGA, resulting from the concentration of wet process acid that does not involve the

direct reaction of phosphate ore in such concentration operations (as of the date of lodging of this Consent Decree, Mosaic does not manufacture SPA);

xx.    Treatment for the purposes of Paragraph 18(a) herein shall mean any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of a waste so as to neutralize such waste or so as to recover energy or material resources from the waste, or so as to remove or reduce a hazardous constituent of the waste or make it safer to transport, store, or dispose of, or amenable for recovery, amenable for storage, or reduced in volume;

yy.    United States shall mean the United States of America, acting on behalf of EPA;

zz.    Upstream Operations shall mean all phosphoric acid mineral processing operations resulting in the manufacture of the First Saleable Product; and

aaa.    Work shall mean any activity that Mosaic must perform to comply with the requirements of this Consent Decree, including Appendices.

## IV. CIVIL PENALTY

9.    Within thirty (30) Days after the Effective Date of this Consent Decree, Mosaic shall pay the sum of $4,100,000.00 as a civil penalty, together with Interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging, in accordance with Paragraphs 10 and 11.

10.    Mosaic shall pay $2,650,000.00, together with Interest accruing from the date on which the Consent Decree is lodged with the Court, to the United States by FedWire Electronic Funds Transfer (EFT) to the U.S. Department of Justice, in accordance with written instructions to be provided by the Financial Litigation Unit of the U.S. Attorney's Office for the Middle District of Florida, 400 N. Tampa Street, Suite 3200, Tampa, Florida, 33602 (813-274-6000) to

Mosaic within ten (10) days of lodging of the Consent Decree.  At the time of payment, Mosaic shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, to the United States in accordance with Section XV (Notices) of this Consent Decree; by email to acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, OH 45268

The transmittal letter shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States et al. v. Mosaic Fertilizer, LLC, and shall reference the civil action number and DOJ case number 90-7-1-08388.

11.     Within thirty (30) Days after the Effective Date of this Consent Decree, Mosaic shall pay the sum of $1,450,000.00 as a civil penalty, together with Interest accruing from the date on which the Consent Decree is lodged with the Court, to FDEP by EFT in accordance with instructions that will be provided by FDEP within ten (10) Days of the lodging of this Consent Decree.  At the time of payment, Mosaic shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, to FDEP in accordance with Section XV (Notices) of this Consent Decree.  The transmittal letter shall state that the payment is for a civil penalty owed pursuant to the Consent Decree in United States et al. v. Mosaic Fertilizer, LLC, and shall reference the FDEP OGC number 12-1041 and DOJ case number 90-7-1-08388.

12.     Mosaic shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating its federal or state or local income tax.

– 19 –

## V.  COMPLIANCE REQUIREMENTS

13.     Compliance Projects and Schedule.  Mosaic shall undertake the actions set forth in Appendix 5 (Best Management Practices (BMP) Plan) and Appendix 6 (RCRA Project Narrative and Compliance Schedule) of this Consent Decree to improve its waste management practices, pursuant to the description and schedule set forth in Appendix 6 (RCRA Project Narrative and Compliance Schedule).  For any wastes generated by or managed in units that are identified in Section VI (Compliance Projects) of Appendix 4 (Facility Reports) as part of the compliance projects set forth in Appendix 6 (RCRA Project Narrative and Compliance Schedule) requiring installation, construction, modification, shut down, or replacement to cease commingling of hazardous wastes with Bevill-Exempt Wastes, and for any wastes that will be managed differently as a result of installing, constructing, modifying, shutting down, or replacing units, as specified in Section VI (Compliance Projects) of Appendix 4 (Facility Reports), Mosaic's waste management obligations under this Section V (Compliance Requirements) shall become effective upon completion of those compliance projects.

14.     Hazardous Waste Determinations.     Mosaic shall make a RCRA hazardous waste determination, pursuant to 40 C.F.R. § 262.11, of all solid wastes generated within AFIP, Upstream or Downstream Operations, or from Mixed-Use, Grandfathered Units, or Recovery Units other than: (a) Bevill-Exempt Wastes and; (b) those wastes  that Paragraphs 15-18 of this Consent Decree allow to (i) be input to Upstream Operations or Downstream Operations or (ii) managed in Recovery Units or (iii) managed with Bevill-Exempt Wastes or (iv) transferred among Mosaic's Florida Facilities, and, if the wastes are hazardous wastes, Mosaic shall manage such wastes in compliance with the RCRA Requirements.

15.   <u>Wastes from Upstream Operations and Co-Managed Wastes</u>.

(a)   Provided that any Phosphogypsum Stack System ultimately receiving the wastes enumerated below is subject to the requirements of Appendix 1, Attachment B (Groundwater and Zone of Discharge Requirements), Attachment C (Phosphogypsum Stack System Construction and Operational Requirements), and Sections I, II, III and VI of Attachment D (Closure of Phosphogypsum Stacks/Stack Systems), as modified by Paragraph 24(b)(1), and the Financial Assurance requirements of this Consent Decree set forth in Paragraph 25 and Appendix 2 (collectively the Stack System Requirements), the following wastes may be: (i) input into Upstream Operations or AFIP; or (ii) treated, stored, managed, transported or disposed of together with Bevill-Exempt Wastes in accordance with this Consent Decree:

(1)   Process Wastewater, Phosphogypsum Stack System Wastewater, and Phosphogypsum;

(2)   Wastes from AFIP;

(3)   Wastes from air pollution control devices that are associated with Upstream Operations or AFIP or that are identified as Mixed-Use Units in a Facility's Facility Report, and

(4)   Wastes generated from the use of Phosphogypsum Stack System Wastewater, Process Wastewater, or NHACS to clean pipes, tanks, process equipment, or other storage or transport units that are:

(i)   Part of Upstream Operations or AFIP;

(ii)   Serve to manage, store, or transport Bevill-Exempt Wastes; or

– 21 –

(iii)    Identified as Mixed-Use or Grandfathered Units in a Facility's Facility Report.

(b)  Prior to commencement of operations of the "Big Holding Tank and Wash Solution System in the Phosphoric Acid Plant" Compliance Project and the "Cleaning Solution Return Piping" Compliance Project of Section VI (Compliance Projects) of Appendix 4 (Facility Reports) at a Facility, Mosaic may continue to manage wastes generated from Upstream Operations, AFIP, Mixed-Use Units, Grandfathered Units, BHT Recovery Units, or units that serve to manage, store, or transport Bevill-Exempt Wastes as specifically documented in Mosaic's consolidated waste management practices submittal dated September 8, 2015.

(c)  Following commencement of operations of the "Big Holding Tank and Wash Solution System in the Phosphoric Acid Plant" Compliance Project and the "Cleaning Solution Return Piping" Compliance Project of Section VI (Compliance Projects) of Appendix 4 (Facility Reports) for each Facility, the following wastes may be input to Upstream Operations via the BHT as described in the Facility's Facility Report set forth in Appendix 4 and in accordance with the BMP set forth in Appendix 5:

(1)    Spills and leaks of all grades of phosphoric acid, sulfuric acid, FSA, SACS, PACS, FSACS, or BHT Effluent; or NHACS, Process Wastewater, or Phosphogypsum Stack System Wastewater when mixed with any of the preceding solutions due to spills, leaks, or cleaning of leaks and spills;

(2)    Wastes generated from the use of SACS, PACS, BHT Effluent, FSA, FSACS, NHACS, Process Wastewater, and/or Phosphogypsum Stack Wastewater to clean pipes, tanks, process equipment, or other storage or transport units that are:

(i)    Part of Upstream Operations or AFIP;

        (ii)        Serve to manage, store, or transport Bevill-Exempt Wastes; or

        (iii)  Identified as Mixed-Use, Grandfathered, or BHT Recovery Units in a Facility's Facility Report.

In the event of a process upset after commencement of operations of the BHT and Cleaning Solution Return Piping Projects that prevents the input of SACS, PACS, BHT Effluent, FSA or FSACS to Upstream Operations via the BHT, Mosaic: (1) shall not discharge to the Phosphogypsum Stack System any SACS, PACS, BHT Effluent, FSA, or FSACS used in cleaning those units affected by the process upset; and (2) shall make a RCRA hazardous waste determination, pursuant to 40 C.F.R. § 262.11, of any cleaning wastes generated from BHT Recovery Units and not input to the BHT and, if the wastes are hazardous, shall manage such wastes in compliance with the RCRA Requirements.

        (d)  If Mosaic, in the cleaning of Upstream Operations, AFIP, Mixed-Use, Grandfathered, or BHT Recovery Units, uses any cleaning materials other than Phosphogypsum Stack System Wastewater, Process Wastewater, BHT Effluent, PACS, SACS, FSA, FSACS, or NHACS that, if evaluated as a solid waste before use, would be a RCRA listed or characteristic hazardous waste as defined by 40 C.F.R., Part 261, Subparts C and D and would generate a hazardous waste when mixed with Bevill-Exempt Process Wastewater under the Bevill Mixture Rule, 40 C.F.R. § 261.3(a)(2)(i) and (g)(4), then Mosaic shall make a RCRA hazardous waste determination pursuant to 40 C.F.R. § 262.11, of the cleaning waste and, if the waste is hazardous, Mosaic shall manage such waste in compliance with the RCRA Requirements.

(e) Mosaic shall manage any solids removed by means other than cleaning solutions from Upstream Operations and AFIP, and from Mixed-Use, Grandfathered, and BHT Recovery Units in accordance with the BMP set forth in Appendix 5.

(f) Equipment maintenance, repair activities, and emergency situations in Downstream Operations at a Facility may occasionally require Mosaic to temporarily store or transport a First Saleable Product in or through tanks or pipes that are part of Upstream Operations, and/or Mixed-Use or Grandfathered Units.  Provided that: a) the use of any individual unit in Upstream Operations, or any Mixed-Use or Grandfathered Unit, for such temporary storage of a First Saleable Product does not exceed ninety (90) Days consecutively or one-hundred twenty (120) Days cumulatively per calendar year; and b) if the First Saleable Product is not stored or transported for greater than ninety (90) Days consecutively outside of Downstream Operations, then the cleaning wastes generated from such units that are used for the temporary transport and storage of the First Saleable Product may be managed with wastes from Upstream Operations. Notice of such temporary use of tanks or pipes that are part of Upstream Operations, or of Mixed-Use or Grandfathered Units, for a First Saleable Product must be given to EPA and FDEP within seven (7) Days of the commencement of such temporary use, but advance approval will not be required.  Mosaic shall keep a log of all such temporary uses. If Mosaic violates any of the time limits set forth in this Paragraph, Mosaic shall not manage cleaning wastes generated outside the prescribed time period with wastes from Upstream Operations.  In the event of a second violation of any of these time limits within three-hundred and sixty-five (365) Days of a first violation, Mosaic within thirty (30) Days shall construct a separate system for the temporary transport and storage of the First Saleable Product, which system shall be part of Downstream Operations. Violations of the time limits set forth in this

Paragraph are not subject to Paragraph 32 (Correction of Non-Compliance) but may be subject to dispute resolution, but not judicial review, under Section XI of this Consent Decree (Dispute Resolution), or to a claim under Section X (Force Majeure).

16.    Wastes from Downstream Operations.  Unless otherwise authorized by Paragraphs 15(a), (b), (c), (e), or (f), Paragraphs 16  (a) - (d),  or Paragraphs 17(a) or (b), below, Mosaic shall manage all hazardous wastes generated from Downstream Operations (including, without limitation, units that transport, store, treat, or manage the First Saleable Product (e.g., pipes, tanks, railcars, barges); chemical manufacturing processes that use the First Saleable Product as a feedstock (e.g., MAP/DAP, SPA or PPA processes); FSA production processes; pollution control devices, waste storage, transport and treatment units, cleaning wastes (liquids and solids), and spills and leaks from all such processes and units) in compliance with the RCRA Requirements, regardless of the use of any Bevill-Exempt Wastes as influent to such Downstream Operations.  If any Mixed-Use Units or Grandfathered Units are replaced, modified, or reconfigured after the date of the relevant Facility Report such that they serve to manage, store or transport materials from Downstream Operations that are not identified in that Facility Report as being associated with those Units, they will be deemed to serve Downstream Operations, and any hazardous wastes generated thereafter from such Units will be subject to this Paragraph.

(a)  Mosaic may re-use or recover certain wastes from Downstream Operations in Upstream or Downstream Operations as specifically documented in each Facility's Facility Report.

(b)  Prior to commencement of operations of the Granular Holding Tank (GHT) pursuant to Section VI (Compliance Projects) of Appendix 4 (Facility Reports) at a Facility,

Mosaic may continue to manage wastes generated in GHT Recovery Units or Downstream Operations as specifically documented in Mosaic's consolidated waste management practices submittal dated September 8, 2015.

(c)  Following commencement of operations of the Granular Holding Tank (GHT) pursuant to Section VI (Compliance Projects) of Appendix 4 (Facility Reports), the following wastes may be input to Downstream Operations via GHT Recovery Units or transferred to the BHT, as described in Section VI (Compliance Projects) of a Facility's Facility Report set forth in Appendix 4 and in accordance with the BMP set forth in Appendix 5:

(1)  Spills and leaks of all grades of phosphoric acid, sulfuric acid, SACS, PACS, or  GHT Effluent; or NHACS, Process Wastewater, or Phosphogypsum Stack System Wastewater when mixed with any of the preceding solutions due to spills, leaks, or cleaning of leaks and spills;

(2)  Wastes generated from the use of Phosphogypsum Stack System Wastewater, Process Wastewater, NHACS, SACS, PACS, BHT Effluent, GHT Effluent, to clean pipes, tanks, process equipment, or other storage or transport units that are part of Downstream Operations.

In the event of a process upset after commencement of operations of the Granular Holding Tank that prevents the input of such wastes via GHT Recovery Units to Downstream Operations, Mosaic shall make a RCRA hazardous waste determination of the cleaning wastes generated from those units affected by the process upset, pursuant to 40 C.F.R. § 262.11 and, if the wastes are hazardous, shall manage such wastes in compliance with the RCRA Requirements.

(d)  Mosaic shall manage any solids removed by means other than cleaning solutions from equipment in Granulation in accordance with the BMP set forth in Appendix 5.

– 26 –

17.   <u>FSA</u>.

(a)   FSA, FSACS, and wastewater carrying entrained solids from FSA production, a part of Downstream Operations, may be managed as described in Section IV.D (Fluorosilicic Acid (FSA) Standard Process Configuration) and Section VI Compliance Project 1 (Big Holding Tank and Wash Solution System in the Phosphoric Acid Plant) and Project 2 (Cleaning Solution Return Piping) of Appendix 4 (Facility Reports) for the Bartow and Riverview Facilities.

(b)   Waste solids not entrained in cleaning solutions but instead mechanically removed from FSA production (such as filtration residue, tank bottoms, and Swift Tower clean-out residue) shall be managed in compliance with the BMP Plan set forth in Appendix 5.

(c)   Wastes generated from FSA production that are not subject to Paragraphs 17(a) and (b) shall be managed in compliance with the RCRA Requirements.

18.   <u>Phosphogypsum Stack System Wastes</u>.

(a)   <u>Wastes from Treatment of Phosphogypsum Stack System Wastes</u>.  Provided that any Phosphogypsum Stack System ultimately receiving the wastes complies with the Stack System Requirements set forth in Paragraph 15(a), wastes generated from the Treatment of materials in the Phosphogypsum Stack System through (i) the use of reverse osmosis or (ii) any other Treatment process that does not introduce into such materials hazardous constituents or other contaminants that would result in a violation of applicable discharge limits may be: (1) input to Upstream Operations; or (2) treated, stored, managed, transported and disposed of together with Bevill-Exempt Wastes, in accordance with this Consent Decree.

(b)   <u>Transfer of Phosphogypsum Stack System Wastes</u>.  Bevill-Exempt Wastes and those wastes allowed to be treated, stored, managed, transported and disposed of together

with Bevill-Exempt Wastes pursuant to Paragraphs 15-18(a) may be transferred among Mosaic's

Florida Facilities as authorized by  FDEP orders, permits, regulations and requirements for such

transfers.

      (c)  The Consent Agreement and Final Orders entered into between EPA and

Mosaic on March 27, 2009, Docket No. RCRA-04-2009-4005(b), and November 3, 2009,

Docket No. RCRA-04-2010-4000(b), shall terminate as separate Orders as of the Effective Date

of this Consent Decree.

      19.   <u>Sulfuric Acid Plants</u>.  Mosaic shall manage hazardous wastes generated at the

Facilities' sulfuric acid plants in accordance with applicable law.

      20.   <u>Site Assessment and Corrective Action</u>.

      (a)   Mosaic has already completed or will complete certain site assessment activities

pursuant to existing RCRA Section 3013 Orders for each of its Facilities that are deemed to

satisfy the site assessment requirements of Paragraphs 1-16 of Appendix 1, Attachment A (Site

Assessment, Reporting and Corrective Action ).  Mosaic's obligations to complete the Corrective

Action Work are part of the Work required by this Consent Decree, but shall be set forth in and

governed by an administrative agreement, permit, or order issued by FDEP under its authorized

state program, and subject to EPA's residual authorities under RCRA and Paragraphs 23 and 82

of this Consent Decree.  Mosaic's performance of its obligations pursuant to the preceding

sentence shall be subject to Paragraph 9 - 16 of Appendix 1, Attachment A, as applicable.

      (b) Mosaic's obligations under Paragraphs 17-19 of Attachment A of Appendix 1 shall be

deemed to be fully satisfied with regard to each Facility on the date that FDEP confirms

Mosaic's certification that Mosaic has completed all requirements of any such administrative

agreement, permit, or order issued by FDEP to govern the Corrective Action Work defined in

Paragraph 8(i), provided that EPA does not exercise its residual authorities under RCRA and this Consent Decree as set forth in Paragraph 23, below.  Appendix 1, Attachment A is included as part of this Consent Decree in order to advise the Court and the public of sampling and analysis activities already completed or that will be completed by Mosaic, pursuant to the RCRA Section 3013 Orders, as part of its settlement with the United States and FDEP, and the Parties' intent to implement any necessary risk assessment and/or Corrective Action Work under FDEP's administrative authorities, and to reflect Plaintiffs' residual authority to secure necessary Corrective Action Work pursuant to their reservation of rights in Paragraphs 82 and 83 of this Consent Decree, and without prejudice to Non-CD Corrective Action that may be required at a Facility pursuant to Plaintiffs' residual authorities under federal, state, and local laws.

21.    <u>Phosphogypsum Stack System</u>.  Paragraphs 21-23 set forth, respectively, the Work that Mosaic must perform relating to the Phosphogypsum Stack System (Paragraph 21), the means for determining when compliance with the Florida Phosphogypsum Rules will satisfy those Work requirements (Paragraph 22), and the conditions under which EPA may exercise its residual authorities to directly enforce those Work requirements (Paragraph 23).

(a)  Mosaic shall comply with all requirements set forth in Appendix 1, Attachment B (Groundwater and Zone of Discharge Requirements), Attachment C (Phosphogypsum Stack System Construction and Operational Requirements), Attachment D (Closure of Phosphogypsum Stacks/Stack Systems), Attachment E (Critical Conditions and Temporary Measures), and Attachment G (Phosphogypsum Stack System Permanent Closure Application).  Notwithstanding the foregoing, the provisions of Section VII (Closure of Unlined Systems in Phosphogypsum Stacks/Stack Systems) of Appendix 1, Attachment D (Closure of Phosphogypsum Stacks/Stack Systems) shall not apply to a Phosphogypsum Stack System or

component thereof that: (i) has already undergone permanent closure pursuant to an FDEP permit or approval; (ii) began undergoing permanent closure prior to January 30, 2007; (iii) complies with or will comply with the requirements, exemptions and conditions of Appendix 7 (Alternative Liner Requirements) upon completion of the projects identified in Appendix 7; or (iv) for which an application for permanent stack closure in a manner that satisfies the requirements of Appendix 1, Attachment D has been submitted to FDEP and/or EPA as of the Date of the EPA Notice of Violation.

(b)  Mosaic shall submit the Initial Phosphogypsum Stack System Closure Plan required in Appendix 1, Attachment D, Section II simultaneously with its first annual updated Cost Estimate submitted pursuant to Appendix 2, Paragraph 4(b).

22.     EPA will consult periodically with FDEP regarding Mosaic's compliance with the Florida Phosphogypsum Rules which require Mosaic to perform the majority of the Work identified in Paragraph 21.  Subject to EPA's reservation of rights in Paragraph 23, if Mosaic complies with the Florida Phosphogypsum Rules, using the definitions of Bevill-Exempt Wastes, Upstream Operations, Downstream Operations, AFIP, and Mixed-Use Units, Recovery Units, and Grandfathered Units set forth in this Consent Decree and employed in the Facility Reports, such compliance shall be deemed to satisfy the Work requirements of Appendix 1, Attachments B, C, D, E, and G, provided that Mosaic also complies with the following specific Work requirements of Appendix 1 that are different from the Florida Phosphogypsum Rules:

(a)  Mosaic shall amend the Initial Phosphogypsum Stack System Closure Plan as needed to include the requirements of Rule 62-673.600(3), F.A.C., and a description of the physical configuration of the Phosphogypsum Stack System and process water inventory in accordance with Appendix 2 (Financial Assurance); and

(b) Mosaic shall amend the Permanent Phosphogypsum Stack System Closure Plans incorporated in the closure operation permit application to conform to the requirements in Rule 62-673.610(7), F.A.C., and must include: (1) a revised estimate of all costs associated with stack closing, long-term care and site-specific water management activities being undertaken under the Permanent Phosphogypsum Stack System Closure Plan in accordance with Appendix 2 (Financial Assurance); and (2) a description of the proposed method of demonstrating financial responsibility for the long-term monitoring and maintenance in accordance with Appendix 2 (Financial Assurance); and

(c) As of the fifth anniversary of the Effective Date of this Consent Decree, all Bevill-Exempt Wastes may only be placed in a Phosphogypsum Stack System: (i) that satisfies the requirements of Appendix 1, Attachment C (Phosphogypsum Stack System Construction and Operational Requirements); (ii) that satisfies the conditions of Appendix 7 (Alternative Liner Requirements); (iii) that Mosaic is addressing pursuant to Paragraph 24(b)(2); (iv) pursuant to Appendix 1, Attachment D (Closure of Phosphogypsum Stacks/Stack Systems); or (v) pursuant to Appendix 1, Attachment E (Critical Conditions and Temporary Measures) or pursuant to any corresponding provisions of the Florida Phosphogypsum Rules.

23.     EPA reserves the right to fully and directly enforce all the requirements of

Appendix 1, Attachment A, if EPA:  (i) notifies Mosaic within sixty (60) Days of FDEP's

issuance of an administrative agreement, permit, or order setting forth and governing the

Corrective Action Work defined in Paragraph 8(i), that such administrative agreement, permit, or

order does not adequately address the Corrective Action Work required under Paragraph 18 of

Appendix 1, Attachment A; or (ii) after consultation with FDEP, notifies Mosaic that it has

determined that Mosaic is not in compliance with an issued administrative agreement, permit, or

order; or (iii) notifies Mosaic within sixty (60) Days of FDEP's  failure to issue an administrative

agreement, permit, or order for Corrective Action Work required under Paragraph 18 of

Appendix 1, Attachment A.  EPA further reserves the right to fully and directly enforce all the

requirements of Appendix 1, Attachment B, and all the requirements of Appendix 1,

Attachments C, D, E, and G, if it finds, after consultation with FDEP, that Mosaic is not in

compliance with the Florida Phosphogypsum Rules, or if the Florida Phosphogypsum Rules are modified and EPA determines, after consultation with FDEP, that such modifications do not comply with the Work requirements of the above-cited Attachments.  Any decision by EPA to directly enforce these Work requirements shall not be subject to judicial review, but shall be subject to dispute resolution (other than judicial review) pursuant to Section XI (Dispute Resolution) of this Consent Decree, although Mosaic retains its right to invoke dispute resolution as set forth in Section XI (Dispute Resolution) regarding any liability for asserted non-compliance with the Work requirements of this Consent Decree, including any liability for stipulated penalties.

24.     a.  <u>Completed Activities</u>.  Mosaic has already completed the following activities, in compliance with the below-referenced Consent Decree Paragraph(s) or Appendices/Attachments to this Consent Decree:

(1) Bartow (i) installation and activation of a new Batch Elementary Neutralization Unit (ENU) to improve the Facility's ability to manage sulfuric acid waste streams (Paragraph 19); (ii) conversion of the #3 cooler scrubber to once-through water from a dedicated non-hazardous DAP Pond or fresh water (Paragraph 15(a)); (iii) FSA Spill and Leak Recovery System (Paragraph 15(a)); (iv) Perimeter Dike Assessments (Appendix 1, Attachment C - Phosphogypsum Stack System Construction and Operational Requirements); and (v) DAP #4 reslurry system (Paragraph 15(a));

(2) New Wales (i) modification of the demineralizer regeneration system to reclaim low pH cation regeneration water into the acid plants, thus reducing the load on the ENU (Paragraph 15(a)); (ii) Perimeter Dike Assessments (Appendix 1, Attachment C - Phosphogypsum Stack System Construction and Operational Requirements); (iii) Auxiliary

Holding Pond (AHP) slurry wall (Appendix 7); and (iv) Installation of Phosphoric Acid Spill and Leak Monitoring System (Paragraph 15(a)); and

(3) Riverview (i) Installation of FSA Spill and Leak Recovery System (Paragraph 15(a)); (ii) Lining of the "Floating Ditch" (Appendix 1, Attachment D - Closure of Phosphogypsum Systems); (iii) Perimeter Dike Assessments (Appendix 1, Attachment C - Phosphogypsum Stack System Construction and Operational Requirements); (iv) conversion of the #6 Granulation cooler scrubber to a closed-loop recirculated scrubber (Paragraph 15(a)); and (v) conversion of the #5 Granulation scrubber to non-hazardous scrubbing media (Paragraph 15(a)).

b. Liner Alternatives.

(1) The Plaintiffs agree that the Facilities' Phosphogypsum Stack Systems (as documented in the Facility Report for each Facility and in Appendix 7 (Alternative Liner Requirements) to this Consent Decree), either (i) meet the liner requirements of Appendix 1, Attachment C (Phosphogypsum Stack System Construction and Operational Requirements); or (ii) complies or will comply with the requirements, exemptions and conditions of Appendix 7 (Alternative Liner Requirements) upon completion of the projects identified in Appendix 7, and thereby are or will be deemed to be environmentally protective and an acceptable alternative to the requirements of Appendix 1, Attachment C (Phosphogypsum Stack System Construction and Operational Requirements).

(2) In the event that Mosaic determines that it is not in compliance with the requirements, exemptions, and/or conditions set forth in Appendix 7 for a Facility, Mosaic within ninety (90) Days of identifying the non-compliance shall investigate the cause of the non-compliance and submit to EPA for approval an Evaluation of Remedial Options to address the

– 33 –

non-compliance.  The Evaluation of Remedial Options must: (i) evaluate the cause of the failure to meet the requirements and/or conditions in Appendix 7; (ii) identify and evaluate those measures needed to return to compliance with Appendix 7; (iii) identify and evaluate potential remedial alternatives to address any groundwater contamination that has migrated beyond the Zone of Discharge permitted for the affected Facility as provided in Appendix 1, Attachment B (Section D); (iv) identify and evaluate potential remedial alternatives to prevent or mitigate further migration of groundwater contamination; and (v) recommend one of the identified remedial alternatives for implementation.  FDEP retains its authority under Sections 62-673.400 and .650, F.A.C. to require that the Phosphogypsum Stack System at the affected Facility be lined if the remedial actions taken by Mosaic do not meet the requirements and conditions set forth in Appendix 7.

(3)  If EPA, in consultation with FDEP, determines that Mosaic is not in compliance with the requirements, exemptions, and/or conditions set forth in Appendix 7 for a Facility, EPA shall so notify Mosaic in a written statement explaining the basis for its conclusion.  Within ninety (90) Days of receiving such notice from EPA, Mosaic shall submit to EPA for approval, in consultation with FDEP, the Evaluation of Remedial Options as required by Paragraph 24(b)(2) or shall submit pursuant to Paragraphs 27-31 a written explanation of why it does not believe the alleged failure exists.

c.  <u>Zones of Discharge</u>.  Plaintiffs agree that Mosaic has a Zone of Discharge authorized by FDEP before the Effective Date of this Consent Decree at each of the following Facilities: Bartow, Riverview, Green Bay, South Pierce, and New Wales, and that such Zone of Discharge at each named Facility shall continue to apply unless modified pursuant to Section I.B. of Attachment B.

25.  <u>Financial Assurance</u>.  Mosaic shall secure and maintain Financial Assurance for the benefit of EPA and FDEP pursuant to the requirements of Appendix 2 (Financial Assurance) of this Consent Decree, in order to ensure coverage for: (a) Third-party Liability; and (b) Phosphogypsum Stack System Closure and Long-Term Care, including for subsection (b) a corporate guarantee provided by The Mosaic Company and attached hereto as Appendix 2, Attachment I.  Mosaic shall secure and maintain financial assurance for Corrective Action Work at the Facilities for the benefit of FDEP as required by any administrative agreement, permit or order issued by FDEP.  If EPA, in lieu of FDEP, directs Corrective Action Work pursuant to this Consent Decree, then Mosaic shall secure and maintain financial assurance for Corrective Action Work for the benefit of EPA pursuant to Appendix 2, Section IV.   To the extent that Mosaic establishes Financial Assurances that includes a cash deposit in a Trust Fund for the benefit of EPA and FDEP, under this paragraph pursuant to the requirements of Appendix 2, FDEP agrees such Trust Fund shall be a cash deposit arrangement under s. 403.4155(3)(b), F.S., for each of the Facilities in accordance with and with respect to the full amounts as specified under Schedule A of the Trust Agreement to be established hereunder.  EPA and FDEP agree that Mosaic and FDEP intend to enter into a separate FDEP Alternate Procedure Order pursuant to Rule 62 673.310, F.A.C., or an equivalent state order, that will further address Mosaic's obligations under Chapter 62-673, F.A.C., with respect to the Phosphogypsum Stack Systems at the Facilities, and at other facilities owned or operated by Mosaic in Florida, and such Alternate Procedure Order shall not reduce or increase the Financial Assurances established hereunder. Mosaic's inability to secure and/or maintain adequate Financial Assurance shall in no way excuse performance of the Work or any other requirement of this Consent Decree.

26.    In addition to the financial assurance information included in the reports required pursuant to Section VIII (Reporting Requirements) of this Consent Decree, Mosaic or The Mosaic Company as guarantor shall provide to EPA and FDEP, upon request, any information or reports that Plaintiffs are authorized to request pursuant to Section 3007 of RCRA, 40 C.F.R. Part 264, Subpart H,  Rule 62-730.180 F.A.C., or any other applicable statutory or regulatory information-gathering authorities, regarding the financial status of Mosaic or The Mosaic Company as guarantor, the financial mechanism(s) provided by Mosaic or the Mosaic Company as guarantor to meet its obligation for Financial Assurance, and the financial institution or guarantor providing the financial mechanism(s) to secure Mosaic's or The Mosaic Company's obligations, pursuant to Appendix 2.

27.    <u>EPA Review of Submissions</u>.  All work plans, reports and other items that are developed and submitted to EPA for approval pursuant to this Consent Decree shall be complete and technically adequate.  After review of any work plan, report, or other item that is required to be submitted, or revised and resubmitted, to EPA for approval pursuant to this Consent Decree, EPA, after consultation with FDEP, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.  In the event of disapproval of any portion of the submission, EPA shall include a statement of the reasons for such disapproval in its response. Plaintiffs' receipt or acceptance of information or notice, or approval of a submittal, does not bind Plaintiffs to the factual assertions and conclusions of the information, notice, or submittal.

28.    If the submission is approved pursuant to Paragraph 27(a), Mosaic shall take all actions required by the work plan, report, or other document, in accordance with the schedules and requirements of the work plan, report, or other document, as approved.  If the submission is

– 36 –

conditionally approved or approved only in part, pursuant to Paragraph 27(b) or (c), Mosaic shall, upon written direction from EPA, take all actions required by the approved work plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Mosaic's right to dispute only the specified conditions, the disapproval, or the determination of the technical severability of portions of the submission under Section XI of this Consent Decree (Dispute Resolution).

29.     If the submission is disapproved in whole or in part, pursuant to Paragraph 27(c) or 27(d), Mosaic shall, within sixty (60) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the submission has been previously disapproved, EPA may impose an earlier due-date for re-submission, but not less than fourteen (14) Days.  If the re-submission is approved in whole or in part, Mosaic shall proceed in accordance with the preceding Paragraph.

30.     Any stipulated penalties applicable to the original submission, as provided in Section IX (Stipulated Penalties) of this Consent Decree, shall accrue during the sixty (60)-Day period or other agreed period, but shall not be payable unless the re-submission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Mosaic's obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent re-submission.

31.     If a resubmitted work plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with FDEP, may again require Mosaic to correct any deficiencies in accordance with the preceding Paragraphs, may itself correct any

deficiencies, or may finally disapprove the submission, subject to Mosaic's right to invoke

dispute resolution under Section XI (Dispute Resolution) and the right of EPA and FDEP to seek

stipulated penalties as provided in the preceding Paragraphs.  If the re-submission is approved or

corrected in whole or in part, Mosaic shall proceed in accordance with Paragraph 27.

      32.   <u>Correction of Non-Compliance</u>.

      (a)  If Mosaic determines, with or without notice from EPA and/or FDEP, that it

is violating, or will violate, any requirement of Section V (Compliance Requirements) of this

Consent Decree, other than those set forth in Paragraphs 15(f) (temporary storage of First

Saleable Product) and 25 (Financial Assurance), Mosaic shall submit with its report of the

violation, pursuant to Section VIII (Reporting Requirements) of this Consent Decree, and shall

subsequently implement, a correction plan to rectify the violation (Correction Plan), if it has not

already corrected the violation by the time of the report.  The Correction Plan shall include a

schedule for correcting the violation.

      (b)   In the event of a violation subject to Paragraph 32(a), Mosaic nevertheless

shall be considered to be in compliance with this Consent Decree for purposes of: (1) continuing

to manage those wastes that Paragraphs 15 through 18 allow to be input to Upstream Operations

or Downstream Operations or managed in Recovery Units or together with Bevill-Exempt

Wastes or transferred among Mosaic's Florida Facilities; and (2) assessing Mosaic's compliance

with this Consent Decree under Paragraphs 34, 79, 80 and 81  of this Consent Decree, provided

that:

      (1)  Mosaic deposits wastes governed by Paragraphs 15-18 only in a

Phosphogypsum Stack System subject to the Stack System Requirements set forth in Paragraph

21(a); and

(2)  Mosaic:

     (i)     Timely implements and completes its Correction Plan; or

     (ii)    Refers an allegation of non-compliance with Section V (Work Requirements) or with a Correction Plan to dispute resolution pursuant to Section XI (Dispute Resolution) and either

         a.     Prevails in the dispute resolution or

         b.     Satisfactorily complies with an EPA or judicial directive to correct any instances of non-compliance

(collectively, Continuing Compliance Criteria).  Nothing in this Paragraph shall be construed as EPA approval of Mosaic's correction efforts pursuant to this Paragraph, as a waiver of stipulated penalties for the violation pursuant to Section IX (Stipulated Penalties), or as limiting the rights reserved by Plaintiffs under Section VI (Work Takeover) or Paragraph 82 of this Consent Decree.  EPA reserves the right to require, upon written request, that a Correction Plan be submitted to EPA for approval in accordance with Paragraphs 27-30, above.  Mosaic's compliance with this Paragraph is without prejudice to its rights under Section X (Force Majeure) and Section XI (Dispute Resolution) of this Consent Decree.

33.    Permits.  Where any compliance obligation under this Section requires Mosaic to obtain a federal, state, or local permit or other form of approval, Mosaic shall submit timely and complete applications and take such actions as are necessary to obtain all such permits or approvals.  A request for supplementation by the permitting agency does not constitute a notice or finding that an application was incomplete for the purpose of this Paragraph unless the permitting agency determines that the original application was so deficient as to constitute a material breach of Mosaic's obligations under this Consent Decree.   Mosaic may seek relief

– 39 –

under the provisions of Section X of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Mosaic has submitted timely and complete applications and has taken such actions as are necessary to timely obtain all such permits or approvals.

34.    Provided that Mosaic remains in compliance with Section V (Compliance Requirements) or the Continuing Compliance Criteria set forth in Paragraph 32 at a Facility, that Facility shall not be required to operate as a Treatment Storage and Disposal Facility pursuant to Section 3005 of RCRA and its implementing federal and/or state regulations, with respect to:

(a) the treatment, storage, transport, management, and disposal of Bevill-Exempt Wastes that have been commingled with hazardous wastes or otherwise managed in violation of law as alleged in the Complaint:

(i) prior to the lodging of this Consent Decree,

(ii) prior to completing the compliance projects set forth in Appendix 6 (RCRA Project Narrative and Compliance Schedule) as provided by Paragraph 13, or

(iii) during timely implementation of a Correction Plan as set forth in Paragraph 32;

(b) wastes that Paragraphs 15 through 18(a) allow to be input to Upstream Operations or Downstream Operations or managed in Recovery Units or together with Bevill-Exempt Wastes; and

(c) wastes that Paragraph 18(b) allows to be transferred among Mosaic's Florida Facilities.

## VI.  WORK TAKEOVER

35.       In the event EPA determines that Mosaic has: (a) ceased implementation of any

portion of the Work; or (b) is seriously or repeatedly deficient or late in its performance of the

Work; or (c) is implementing the Work in a manner that may cause an endangerment to human

health or the environment, EPA, after consultation with FDEP and with the joint approval of the

EPA Region 4 Regional Administrator and the Assistant Administrator for the EPA Office of

Enforcement and Compliance Assurance, may issue a written notice (Work Takeover Notice) to

Mosaic.  Any Work Takeover Notice issued by EPA shall specify the grounds upon which such

notice was issued and shall provide Mosaic a period of thirty (30) Days within which to remedy

the circumstances giving rise to EPA's issuance of such notice.

36.       If, after expiration of the thirty (30) Day period specified in Paragraph 35 of this

Section, the Work Takeover Notice has not been withdrawn by EPA and Mosaic has not

remedied to EPA's satisfaction the conditions giving rise to EPA's issuance of the Work

Takeover Notice, EPA at any time thereafter may undertake Work Takeover by assuming and/or

directing the performance of; or seeking the appointment of a receiver to direct the performance

of any or all Work that EPA deems necessary to correct the violations or conditions that triggered

the Work Takeover Notice pursuant to Paragraph 35 (Work Takeover).  In either case, and only

with the concurrence of FDEP, EPA may utilize Financial Assurance for Phosphogypsum Stack

System Closure, Long-Term Care, and/or Corrective Action as authorized by this Consent Decree to

correct the violations or conditions that triggered the Work Takeover Notice. EPA shall notify

Mosaic in writing (which writing may be electronic) if EPA determines that implementation of a

Work Takeover is warranted under this Section of the Consent Decree.  In the event that EPA

seeks to appoint a receiver to direct the performance of the Work, Mosaic shall not oppose such

appointment on grounds other than lack of competence or conflict of interest, but shall retain its right to challenge the underlying Work Takeover in Dispute Resolution, as set forth in the following Paragraph and Section XI (Dispute Resolution) of this Consent Decree.  In implementing any Work Takeover, EPA shall make reasonable efforts not to interfere with Facility operations not directly affected by the conditions that triggered the Work Takeover.

37.     In the event that Mosaic invokes Section XI (Dispute Resolution) of the Consent Decree with respect to EPA's Work Takeover and/or its selection of  options set forth in Paragraph 36 (which must be disputed together with the underlying Work Takeover and pursuant to Paragraph 70(a) of this Consent Decree), EPA during the pendency of any such dispute may, in its unreviewable discretion, commence and continue a Work Takeover until the earlier of: (a) the date that Mosaic remedies, to EPA's satisfaction, the circumstances giving rise to issuance of the Work Takeover Notice; or (b) the date that a final decision is rendered in accordance with Section XI (Dispute Resolution) of the Consent Decree requiring EPA to terminate such Work Takeover.

38.     After commencement and for the duration of any Work Takeover, EPA or any appointed receiver shall have the immediate benefit of any Financial Assurance provided pursuant to Paragraph 25 and Appendix 2 (Financial Assurance) of this Consent Decree to implement the Work.  If EPA or any appointed receiver are unable to access to the Financial Assurance, or the Work addressed by the Work Takeover is not covered by Financial Assurance, then any unreimbursed costs incurred by EPA in connection with the Work Takeover shall be considered a financial obligation owed by Mosaic to the United States and collectible in an action to enforce this Consent Decree.  Nothing in this Paragraph shall be construed to relieve Mosaic of its obligation to provide adequate Financial Assurance pursuant to Appendix 2.

In the event that it is determined in Dispute Resolution that the Work Takeover was not warranted, any unexpended funds in a Stand-by Trust that originated from a letter of credit or surety bond shall be used to restore any pre-existing Trust Fund to the pre-Work Takeover level, if necessary, and any balance of unexpended funds shall be released and used to re-establish the original financial mechanism(s).

## VII.   SUPPLEMENTAL ENVIRONMENTAL PROJECT

39.    FDEP and Mosaic have agreed on a Supplemental Environmental Project ("SEP") as described herein in Appendix 9.  Mosaic, under the oversight of FDEP, shall remediate seepage breakout at the Mulberry Facility South Cooling Pond as further described in Appendix 9, and subject to the following conditions:

(a)    The cost of the SEP shall be based on direct expenditures for engineering services, materials, and for other third-party contractors or vendors, where needed to perform the SEP (the "Applicable SEP Costs").  Mosaic shall complete the SEP remediation described herein in Appendix 9, to the extent the Applicable SEP Costs do not exceed $1.2 Million.

(b)    Remediation shall continue to be performed by Mosaic until performance in full has been completed as described in Appendix 9.

(c)    If Mosaic determines that the costs of the SEP will or are likely to exceed $1.2 million in Applicable SEP Costs as a result of an "Unanticipated Event" or "Differing Site Condition," Mosaic shall immediately so inform FDEP and suspend the SEP remediation and, to the extent feasible, do so prior to incurring Applicable SEP Costs in excess of $1.2 million.  For the purposes of this paragraph, "Unanticipated Event" or "Differing Site Condition," shall mean concealed or latent physical conditions or subsurface conditions at a portion of the site affecting the SEP remediation that (i) materially differ from the conditions described in Appendix 9 or

– 43 –

(ii) are of an unusual nature, differing materially from the conditions ordinarily encountered and generally recognized as inherent in the applicable SEP remediation. Following notice that performance of the SEP will exceed the above threshold, FDEP may either:  (i) require a modification to the SEP to allow the Applicable SEP Costs to not exceed $1.2 million, or (ii) reach an agreement with Mosaic on any additional funds and the source of such funds that may be used to fund all or some portion of the Applicable SEP Costs in excess of $1.2 million.

(d)   If Mosaic fails to timely submit the notification of completion, or otherwise fails to complete the SEP within the timeframes provided in Paragraph 39(b), or if upon review of the certification of construction completion, FDEP determines that the project cannot be accepted due to a substantially incomplete certification of completion or due to substantial deviations from the approved SEP, Mosaic will be notified, in writing, of the reason(s) that prevent the acceptance of the project.  Mosaic shall address all of the matters identified by FDEP that are inconsistent with the SEP described in Appendix 9, or the timeframes herein required, and submit a new certification of completion within 45 Days of receipt of FDEP's notice, unless such FDEP notice specifies a greater period of time for submittal of a new certification of completion.  If Mosaic, despite its best efforts to do so, fails to complete the SEP or if upon review of the new submittal, FDEP determines that the SEP is still incomplete or not in accordance with the SEP described in Appendix 9, Mosaic shall pay a stipulated penalty to FDEP equal to the greater of: (i) $1.2 Million (less the costs that Mosaic incurred on the SEP up to a maximum of $1.2 Million), or (ii) $25,000.

## VIII. REPORTING REQUIREMENTS

40.      If Mosaic determines that it has violated or will violate, any requirement of this Consent Decree, Mosaic shall (unless otherwise directed by EPA or FDEP) notify EPA and FDEP of such violation and its likely duration, in writing, within twelve (12) Days of the date Mosaic first becomes aware of the violation, with an explanation of the likely cause of the violation and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Mosaic shall so state in the report.  Mosaic shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of any identifiable cause(s) of the violation, within thirty (30) Days of the date Mosaic becomes aware of the violation.  Nothing in this Paragraph or Paragraphs 41 and 42 relieves Mosaic of its obligation to provide the notice required by Section X of this Consent Decree (Force Majeure).

41.      Periodic Reporting.

(a)      On or before the 15th day of the second month following the end of each calendar-quarter after lodging of this Consent Decree (quarters shall be calculated based on Mosaic's December 31st end-of-fiscal-year), until the quarter ending after the completion of the final compliance project identified in Appendix 6, Mosaic shall submit to EPA and FDEP a report for each Operating Facility for the preceding calendar quarter, that shall include (i) the status of any construction or compliance measures described in Appendix 6 and the applicable Facility Report for each Operating Facility; (ii) completion of milestones set forth in Appendix 6; (iii) problems encountered or anticipated, together with implemented or proposed solutions, with projects described in Appendix 6 and in the applicable Facility Report for each Operating Facility; (iv) status of permit applications for projects described in Appendix 6; (v) status of

– 45 –

plans for closure and long-term care and status of permit application, as applicable, for closure or long-term care; (vi) operation and maintenance difficulties or concerns relating to wastes managed pursuant to Paragraphs 15 – 18, or projects described in Appendix 6; (vii) status of Financial Assurance; (viii) a discussion of Mosaic's progress in satisfying its obligations in connection with the SEP under Section VII of this Consent Decree, including, at a minimum, a narrative description of activities undertaken and the status of any construction or compliance measures; (ix) a description of any violation of the requirements of this Consent Decree reported under Paragraph 40 and an explanation of the likely cause of such violation and of the remedial steps taken, or to be taken, to prevent or minimize such violation; (x) the log of any temporary use of units in Upstream Operations, Mixed-Use Units or Grandfathered Units for the storage of the First Saleable Product,  (xi) the log of spills and leaks tracked pursuant to the BMP set forth in Appendix 5, and (xii) identification of any confirmed "critical condition," as defined and reported to FDEP and/or EPA pursuant to Appendix 1.

(b)     Thereafter, and for a period of two (2) years, Mosaic shall submit such reports to EPA and FDEP for each Operating Facility on a semi-annual basis.  Thereafter Mosaic shall submit such reports annually until such time as Mosaic submits the Closure Application for an Operating Facility pursuant to Appendix 1 Attachment D (Closure of Phosphogypsum Stacks/ Stack Systems).  Mosaic shall submit its next report within one-hundred-eighty (180) Days after the submission of the Closure Application, and annually thereafter until this Consent Decree is terminated with respect to that Operating Facility.

(c)     Following completion of the compliance projects "Big Holding Tank and Wash Solution System in Phosphoric Acid Plant" and "Granulation Wash Reconfiguration," in Appendix 6 (RCRA Project Narrative & Compliance Schedule), Mosaic shall submit to EPA and

FDEP a report for each Operating Facility within forty-five (45) Days after the end of each calendar quarter identifying any transfer(s) of GHT Effluent to the BHT during the reporting period, including the following information: (i) the date of any transfer(s); (ii) the reason for the transfer; (iii) the volume of the contents in the GHT when Mosaic started and ceased use of the transfer line; (iv) the volume transferred; and (v) a proposal for minimizing, if possible, any reoccurrence of the non-routine event that led to the transfer.  These reports shall be submitted quarterly for a period of three (3) years following project completion.  Thereafter, Mosaic shall submit such reports annually until such time as Mosaic submits the Closure Application for a Facility pursuant to Appendix 1 Attachment D (Closure of Phosphogypsum Stacks/ Stack Systems).

   (d) By February 15of each calendar year after lodging of this Consent Decree, Mosaic shall submit reports for each Closing Facility that shall include:  (i) status of plans for closure and long-term care; and (ii) identification of any confirmed "critical condition," as defined and reported to FDEP and/or EPA pursuant to Appendix 1.

  42. Whenever any violation of this Consent Decree, or any other event affecting Mosaic's performance under this Consent Decree or the performance of its Facility may pose an immediate threat to the public health or welfare or the environment, Mosaic shall, unless otherwise directed, notify EPA and FDEP in Section XV (Notices), orally or by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after Mosaic first knew of the event, and shall comply with the requirements of Appendix 1, Attachment E (Critical Conditions and Temporary Measures).  Any violation of this notice requirement shall be deemed to terminate on the Day that both EPA and FDEP have received actual notice of the violation or event from Mosaic or by other means.  This notice requirement does not relieve

Mosaic of its obligation to comply with any federal and state laws applicable to the violation or event.  This notice requirement is in addition to the requirement to provide notice of a violation of this Consent Decree set forth in Paragraph 40.

43.     All notices and submittals to "EPA and/or FDEP" under this Consent Decree (including Appendices), other than those required by this Section or that are submitted for approval pursuant to Paragraphs 27-29, may be submitted to FDEP only, provided that a copy of the cover letter identifying the notice or submittal is also sent to EPA.  Mosaic also shall supply EPA with a copy of such notice(s) or submittal(s) upon request by EPA.

44.     Each report submitted by Mosaic under this Section shall be signed by a responsible corporate official of Mosaic (as defined in 40 C.F.R. § 270.11(a)) and shall include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency notifications where compliance would be impractical.

45.     The reporting requirements of this Consent Decree do not relieve Mosaic of any reporting obligations required by the RCRA Requirements or by any other federal, state, or local law, regulation, permit, or other requirement.  However, the reporting requirements of this Consent Decree shall not require Mosaic to re-submit any report, plan or information submitted by Mosaic to EPA and/or FDEP prior to the Effective Date of this Consent Decree.

– 48 –

46.     Any information provided pursuant to this Consent Decree may be used by the Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

### IX. STIPULATED PENALTIES

47.     Mosaic shall be liable for stipulated penalties to the United States and FDEP for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

48.     Civil Penalty.  If Mosaic fails to pay the civil penalty required to be paid under Section IV of this Consent Decree (Civil Penalty) when due, Mosaic shall pay a stipulated penalty of $1,000 per Day for each Day that the payment is late for the first ten (10) Days, together with Interest.  Thereafter, Mosaic shall pay $3,000 per Day for each Day that the payment is late, with Interest.  Late payment of the civil penalty shall be made in accordance with Section IV (Civil Penalty), Paragraph 10.  Stipulated penalties for late payment of the civil penalty shall be paid in accordance with Paragraphs 64, 65, 67 and 68, below.  All transmittal correspondence shall state that any such payment is for late payment of the civil penalty due under this Consent Decree, or for stipulated penalties for late payment, as applicable, and shall include the identifying information set forth in Paragraph 10, above.

49.     Compliance Requirements.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Section V (Compliance Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

Stipulated penalties shall not apply to spills and leaks of products and wastes that are managed in compliance with the approved BMP set forth in Appendix 5.

50.    Reporting Requirements.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements of Section VIII of this Consent Decree (Reporting Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,000 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

51.    Subject to the provisions of Paragraph 30, above, and except as otherwise specified in Paragraphs 54(b), stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

52.    Mosaic shall pay stipulated penalties to the United States and to FDEP within twelve (12) Days of a written demand by either Plaintiff, subject to its right to invoke dispute resolution in accordance with Section XI (Dispute Resolution).  Except as provided in Paragraph 39(d), Mosaic shall pay fifty percent (50%) of the total stipulated penalty amount due to the

United States and fifty percent (50%) to FDEP.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

53.     Each Plaintiff, may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to it under this Consent Decree. The determination by one Plaintiff not to seek stipulated penalties, or to subsequently waive or reduce the amount it seeks, shall not preclude the other Plaintiff from seeking the full amount of the stipulated penalties owed.

54.     Stipulated penalties shall continue to accrue as provided in Paragraph 51, during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved by agreement or by a decision of the United States or FDEP that is not subject to judicial review or appealed to the Court, Mosaic shall pay accrued penalties determined to be owing, together with Interest, to the United States or FDEP within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or FDEP's decision or order.

b.      If the dispute is appealed to the Court and the United States or FDEP prevails in whole or in part, Mosaic shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) Days of receiving the final Court decision.

55.     Mosaic shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  Mosaic shall pay stipulated penalties owing to FDEP in accordance with Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

56.      Mosaic shall not deduct stipulated penalties paid under this Section in calculating its state and federal income tax.

57.      If Mosaic fails to pay stipulated penalties according to the terms of this Consent Decree, Mosaic shall be liable for Interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States or FDEP from seeking any remedy otherwise provided by law for Mosaic's failure to pay any stipulated penalties.

58.      Subject to the provisions of Section XIII (Effect of Settlement/ Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or FDEP for Mosaic's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of relevant statutory or regulatory requirements, Mosaic shall be allowed a credit for any stipulated penalties paid against any statutory penalties imposed for such violation.

## X. FORCE MAJEURE

59.       Force majeure, for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Mosaic, of any entity controlled by Mosaic, or of Mosaic's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Mosaic's best efforts to fulfill the obligation.  The requirement that Mosaic exercise best efforts to fulfill the obligation includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (1) as it is occurring and (2) following the potential force majeure such that the delay and any

adverse effects of the delay are minimized to the greatest extent possible.  Force majeure does not include Mosaic's financial inability to perform any obligation under this Consent Decree.

60.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Mosaic shall provide notice orally or by electronic or facsimile transmission to EPA and FDEP as soon as possible, as provided in Section XV (Notices) of this Consent Decree, but not later than seven (7) Days after the time when Mosaic first knew that the event might cause a delay.  Within ten (10) Days thereafter, Mosaic shall provide written notice to EPA and FDEP with an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Mosaic's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Mosaic, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Mosaic shall include with any notice all available documentation supporting a claim that the delay was attributable to a force majeure event.  Mosaic shall be deemed to know of any circumstance of which Mosaic, any entity controlled by Mosaic, or Mosaic's contractors knew or reasonably should have known.  Failure to comply with the above requirements regarding an event shall preclude Mosaic from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 59 and whether Mosaic has exercised its best efforts under Paragraph 60, EPA may, in its unreviewable discretion, excuse in writing Mosaic's failure to submit timely notices under this Paragraph.

61.     If EPA, after consultation with FDEP, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after consultation with FDEP, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  If EPA, after consultation with FDEP, agrees that the delay is attributable to a force majeure event, EPA will notify Mosaic in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

62.     If EPA, after consultation with FDEP, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Mosaic in writing of its decision.

63.     If Mosaic elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice.  In any such proceeding, Mosaic shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Mosaic complied with the requirements of Paragraphs 59 and 60, above.  If Mosaic carries this burden, the delay at issue shall not be a violation by Mosaic of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI. DISPUTE RESOLUTION

64.      Unless otherwise expressly provided for in this Consent Decree, the dispute

resolution procedures of this Section shall be the exclusive mechanism to resolve all disputes

arising under or with respect to this Consent Decree. Mosaic's failure to seek resolution of a

disputed issue under this Section shall preclude Mosaic from raising any such issue as a defense

to an action by the United States or FDEP to enforce any obligation of Mosaic arising under this

Consent Decree.

65.      <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under

this Consent Decree shall first be the subject of informal negotiations, which may include any

third-party assisted, non-binding alternative dispute resolution process agreeable to the

Parties.  Mosaic shall submit a written Notice of Dispute to both the United States and FDEP

within thirty (30) Days after receiving written notice from EPA (or FDEP with respect to Section

VII (Supplemental Environmental Projects)) of a decision that Mosaic disputes. The dispute shall

be considered to have arisen on the later of the dates that the United States or FDEP receives

a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in

dispute.  The period of informal negotiations shall not exceed twenty (20) Days from the date

that the dispute arises, unless that period is modified by written agreement between the United

States (or FDEP with respect to Section VII (Supplemental Environmental Projects)) and

Mosaic.  If the Parties cannot resolve a dispute by informal negotiations, then the position of

EPA, after consultation with FDEP, or of  FDEP with respect to Section VII (Supplemental

Environmental Projects, shall be considered binding, unless Mosaic invokes formal dispute

resolution procedures as provided in the following Paragraph.

66.    Formal Dispute Resolution.  If Mosaic elects to invoke formal dispute resolution, Mosaic shall, within thirty (30) Days after the conclusion of the informal negotiation period, submit to EPA and FDEP, or to FDEP only with respect to Section VII (Supplemental Environmental Projects), a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Mosaic's position and any supporting documentation relied upon by Mosaic.

67.    EPA, after consultation with FDEP, or FDEP with respect to Section VII (Supplemental Environmental Projects), shall submit its Statement of Position within forty-five (45) Days of receipt of Mosaic's Statement of Position.  The EPA or FDEP Statement of Position shall include or clearly reference, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by EPA or FDEP.  Where appropriate, EPA (or FDEP with respect to Section VII (Supplemental Environmental Projects)) may allow submission of supplemental statements of position by the Parties to the dispute. The EPA or FDEP Statement of Position shall be binding on Mosaic unless Mosaic files a motion for judicial review of the dispute in accordance with the following Paragraph.

68.    Mosaic may seek judicial review of the dispute by filing with the Court and serving on the United States and FDEP, in accordance with Section XV (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of EPA's Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Mosaic's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set

forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

69.     The United States, after consultation with FDEP, or FDEP with respect to Section VII (Supplemental Environmental Projects), shall respond to Mosaic's motion within the time period allowed by the Local Rules of this Court. Mosaic may file a reply memorandum to the extent permitted by the Local Rules.

70.     <u>Standard of Review.</u>

a.  <u>Disputes Concerning Matters Accorded Record Review.</u>  In any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the Work performed pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, EPA shall compile an administrative record of the dispute containing all Statements of Position, including supporting documentation and referenced data or information, and Mosaic shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.  In any other dispute brought under this Section, Mosaic shall bear the burden of demonstrating that its position complies with and furthers the objectives of this Consent Decree.

71.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Mosaic under this Consent Decree, unless and until final resolution of the dispute so provides or unless ordered by the Court.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the

first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 54.  If Mosaic does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.  INFORMATION COLLECTION AND RETENTION

72.     The United States, FDEP, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any of Mosaic's Florida Facilities, at all reasonable times, upon presentation of appropriate identification, to:

a.   monitor the progress of activities required under this Consent Decree;

b.   verify any data or information submitted to the United States or FDEP in accordance with the terms of this Consent Decree;

c.  obtain samples and, upon request, splits of any samples taken by Mosaic or its representatives, contractors, or consultants;

d.   obtain documentary evidence, including photographs and similar data;

e.   assess Mosaic's compliance with this Consent Decree; and

f.    conduct, direct or review Work pursuant to Section VI (Work Takeover) of this Consent Decree.

73.     Upon request, Mosaic shall provide EPA, FDEP and their authorized representatives splits of any samples taken by Mosaic.  Upon request, EPA and FDEP and their authorized representatives shall provide Mosaic splits of any samples taken by EPA, FDEP, and their authorized representatives.

74.     Mosaic shall retain, and shall require its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, emails or other information in electronic form and including any documents, records,

data or other information underlying the submission of any Report required pursuant to Section VIII (Reporting Requirements)) in its or its contractors or agents possession or control, or that come into its or its contractors' or agents' possession or control and that relate to Mosaic's performance of its obligations under this Consent Decree or adherence to the requirements associated with the management of waste materials allowed under Paragraphs 15 through 18 for a period of five (5) years after the creation of such documents, records or other information.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or FDEP, Mosaic shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

75.     At the conclusion of the information-retention period provided in the preceding Paragraph, Mosaic shall notify the United States and FDEP at least ninety (90) Days prior to Mosaic's destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph.  Unless otherwise directed by EPA in consultation with FDEP, Mosaic shall require its contractors and agents to provide the same notice to Mosaic with respect to their materials, and shall promptly relay any such notices to the United States and FDEP. Upon request by the United States or FDEP, Mosaic shall deliver any such documents, records, or other information to EPA or FDEP.  Mosaic shall not dispose of materials following the expiration of its five (5) year retention period more often than once a year.

76.     In connection with any request for documents, records, or other information pursuant to this Consent Decree, Mosaic may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege recognized by federal law, provided that Mosaic shall not assert a legal privilege for any data, records or

information (excluding legal advice) generated or received in connection with Mosaic's

obligations pursuant to the requirements of this Consent Decree.  If Mosaic asserts a privilege,

it shall provide the following: (1) the title of the document, record, or information; (2) the date of

the document, record, or information; (3) the name and title of each author of the document,

record, or information; (4) the name and title of each addressee and recipient; (5) a description of

the subject of the document, record, or information; and (6) the privilege asserted by Mosaic.

If Plaintiffs and Mosaic disagree as to whether a particular document or record is privileged,

Mosaic shall deliver such document or record to the United States or the FDEP unless it invokes

dispute resolution pursuant to Section XI (Dispute Resolution), in which case, Mosaic shall not

have an obligation to deliver such document or record until a final determination is made,

pursuant to the procedures set forth in Section XI (Dispute Resolution), that such document or

record is not privileged.

77.     Mosaic may also assert that information provided pursuant to this Consent

Decree is protected as Confidential Business Information (CBI) under the criteria and procedures

set forth in 40 C.F.R. Part 2, provided that: (a)  Mosaic shall not assert a CBI claim with respect

to any physical, sampling, monitoring, or analytical data other than data related to:

(i) development of new or modified products; (ii) development of new or modified production

processes; (iii) production materials or analyses collected for quality control or other

manufacturing purposes; or (iv) analyses undertaken for competitive business purposes; and

(b)  Mosaic shall not assert a CBI claim for Financial Assurance information required to be

provided pursuant to Paragraphs 10.e, 15.(e) and 32 of Appendix 2 of this Consent Decree.

If Mosaic claims any information related to Financial Assurance submissions and Cost Estimates

is CBI, Mosaic shall submit two versions, one version with the CBI material redacted, and so

identified in the document, which will be publicly available, and the second version will contain the CBI material.

78.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or FDEP pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Mosaic to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

79.     This Consent Decree resolves the civil claims of the United States and FDEP against Mosaic, and, as to any liability arising out of Mosaic's liability only, The Mosaic Company, for the violations at the Facilities alleged in the Complaint filed in this action through the date of the lodging of the Consent Decree.  This Consent Decree also resolves such claims, if any, of the United States and FDEP against the corporate officers, directors, and employees, acting in their capacities as such, of Mosaic or The Mosaic Company, but only as to liability arising out of Mosaic's liability.  For continuing violations alleged in the Complaint, provided that Mosaic complies with this Consent Decree at a Facility, as set forth in Paragraph 81, from the date of lodging of the Consent Decree through its Effective Date, these claims shall also be resolved through the Effective Date of this Consent Decree, as of the Effective Date, for that Facility; and, provided that Mosaic complies with the Consent Decree at a Facility from the Effective Date of this Consent Decree through the date of termination of this Consent Decree for that Facility pursuant to Section XIX (Termination), these claims shall be finally resolved as of the date the Consent Decree terminates for that Facility.

80.     Provided that Mosaic is in compliance with this Consent Decree, and subject to the reservation set forth below, Plaintiffs covenant not to sue or take administrative action under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), or its state counterpart, seeking to require Mosaic's Facilities to comply with the RCRA Requirements, with respect to: (a) the generation, treatment, storage, transport, management, and disposal of Bevill-Exempt Wastes that have been commingled with hazardous wastes or otherwise managed in violation of law as alleged in the Complaint, and that are resolved in accordance with Paragraph 79; and (b) wastes that Paragraph 15-18 of this Consent Decree allow to be input to Upstream Operations or Downstream Operations or managed in Recovery Units or with Bevill-Exempt Wastes or transferred among Mosaic's Florida Facilities.  Nothing in this Paragraph, however, shall affect Plaintiffs' rights to determine and require necessary Corrective Action Work in accordance with Paragraphs 20 and 23 of this Consent Decree, or to restrict Non-CD Corrective Action that may be required at a Facility pursuant to Plaintiffs' residual authorities under federal, state, and local laws.

81.     The resolution under this Section XIII (Effect of Settlement/Reservation of Rights) of the Plaintiffs' civil claims set forth in the Complaint and the Plaintiffs' covenants not to sue are expressly conditioned upon Mosaic's timely and satisfactory compliance with the requirements of this Consent Decree.  For the purposes of this Paragraph (and Paragraphs 79 and 80), and with respect to those wastes that Paragraphs 15 through 18 allow to be input to Upstream Operations or Downstream Operations, managed in Recovery Units or together with Bevill-Exempt Wastes, or transferred among Mosaic's Florida Facilities, compliance with the Continuing Compliance Criteria set forth in Paragraph 32 constitutes compliance with this Consent Decree.

82.     The United States and FDEP reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, and Mosaic reserves all legal and equitable defenses available to it in the defense of any such enforcement.  This Consent Decree shall not be construed to limit the rights of the United States or FDEP to obtain penalties or injunctive relief under the federal and state environmental statutes or their implementing regulations, or under other federal or state law, regulations, or permit conditions, including Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), except as expressly specified in Paragraphs 79 and 80, and Mosaic in any such action shall not assert any defense based upon the contention that such claims raised by the Plaintiffs were or should have been brought in the instant case under principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other such defense.  The United States and FDEP further retain all authority and reserve all rights to take any and all actions authorized by law to protect human health and the environment, including Corrective Action Work and Non-CD Corrective Action, and all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Mosaic's Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

83.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local law or regulation.  While this Consent Decree resolves the Parties' dispute regarding the violations alleged in the Complaint as set forth in Paragraph 79, compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  Except as provided in Paragraphs 34, 79 and 80 of this Consent Decree, Mosaic is not relieved of its obligation to achieve and maintain compliance with all applicable federal, State, and local laws, regulations, and permits; Mosaic's compliance with this

Consent Decree shall be no defense to any action commenced by Plaintiffs pursuant to any such law, regulation, or permit, except as expressly specified in Paragraphs 34, 79 and 80.  84. This Consent Decree does not limit or affect the rights of the Parties against any third-parties (persons not a Party to this Consent Decree), nor does it limit the rights of third-parties except as otherwise provided by the doctrine of federal preemption or by other applicable principles of law or precedent.

85.     This Consent Decree shall not be construed to create rights or obligations in, or grant any cause of action to, any third-party.

86.     Nothing in the Complaint filed in this action or in this Consent Decree, including the execution and implementation of this Consent Decree, shall constitute an admission by Mosaic of any violation of the RCRA Requirements or of any of the allegations of the Complaint.  Mosaic reserves all rights to dispute the factual and legal representations of the Complaint and Consent Decree except in an action to enforce this Consent Decree by a Party. The terms of this Consent Decree may not be used as evidence in any litigation between the Parties except (a) pursuant to Section XI (Dispute Resolution), (b) in an action to enforce this Consent Decree, or (c) in an action by Plaintiffs in which Mosaic asserts a defense based on this Consent Decree.

## XIV. COSTS

87.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and FDEP shall be entitled to collect costs (including attorneys' fees) incurred in any action necessary to access Financial Assurance pursuant to Paragraph 26 and Appendix 2 (Financial Assurance) of this Consent Decree, or to collect any portion of the

civil penalty or any stipulated penalties or other costs due under this Consent Decree but not paid

by Mosaic.

## XV. NOTICES

88.     Unless otherwise specified in this Consent Decree, whenever notifications,

submissions, or communications are required by this Consent Decree in accordance with Section

VIII, Reporting Requirements, they shall be made electronically, unless otherwise requested by

either FDEP or EPA, and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S.  Department of Justice
Re: DOJ No.  90-7-1-08388

| by email:<br>c/o<br>Deborah.Reyher@usdoj.gov<br>(or a successor identified by<br>DOJ in writing) | by fax:<br><br>(202) 616-6584 | by regular mail or post office express mail:<br><br>Box 7611 Ben Franklin Station<br>Washington,<br>D.C. 20044-7611 | by private overnight service:<br><br>601 D Street, NW.,<br>2nd floor<br>Washington,<br>D.C. 20004 |
|---|---|---|---|

and to EPA, below.

To EPA:

Alan A. Annicella and Joan Redleaf Durbin (or successors identified by EPA in writing)
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960
Phone: (404) 562-8610
Fax: (404) 562-8078
annicella.alan@epa.gov
redleaf-durbin.joan@epa.gov

Van Housman and Bethany Russell (or successors identified by EPA in writing)
Office of Civil Enforcement
Mail Code 2249A
U.S. Environmental Protection Agency
Clinton Building - South
 1200 Pennsylvania Ave., NW
Washington, D.C.  20460
Phone: (202) 564-0143
Fax: (202) 564-0019
russell.bethany@epa.gov
housman.van@epa.gov
-and with respect to notices pertaining to Financial Assurance:

Robert Stewart (or a successor identified by EPA in writing)
USEPA - Region 4
Atlanta Federal Center - 10th Floor
61 Forsyth Street, SW
Atlanta, GA 30303-8960
Stewart.robertg@epa.gov


-and with respect to notices pertaining to technical matters to a contractor to be identified by
EPA in writing.


To FDEP:

Tim Bahr (or a successor identified by FDEP in writing)
Program Administrator
Permitting and Compliance Assistance Program
Department of Environmental Protection
2600 Blair Stone Road, MS 4560
Tallahassee, FL 32399-2400
Tim.Bahr@dep.state.fl.us

Elsa A. Potts (or a successor identified by FDEP in writing)
Administrator
Industrial Wastewater Program
Department of Environmental Protection
2600 Blair Stone Road, MS 3545
Tallahassee, FL 32399-2400
Elsa.Potts@dep.state.fl.us

To Mosaic and The Mosaic Company:

David Jellerson (or a successor identified by Mosaic in writing)
Senior Director of Environmental
Mosaic Fertilizer, LLC
13830 Circa Crossing Drive
Lithia, FL 33547

Patrick van der Voorn (or a successor identified by The Mosaic Company in writing)
The Mosaic Company
Senior Environmental Counsel
Atria Corporate Center, Suite E490
3033 Campus Drive
Plymouth, MN 55441

To Arnold & Porter LLP (Counsel for Mosaic):
Joel M. Gross
Lester Sotsky
Peggy Otum
Eric Rey
(or successors identified by Mosaic in writing)
Arnold & Porter LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001-3743

89.     Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

90.     Notices submitted pursuant to this Section shall be deemed submitted upon

electronic transmission, unless otherwise provided in this Consent Decree or by mutual

agreement of the Parties in writing.

## XVI.  EFFECTIVE DATE

91.     The Entry Date of this Consent Decree shall be the date of a Final Order by which

this Consent Decree is entered by the Court or by which a motion to enter the Consent Decree is

granted, whichever occurs first, as recorded on the Court's docket.  The Effective Date of this

Consent Decree shall be the later of the Entry Date of this Consent Decree or the Entry Date of

the Consent Decree resolving claims by the United States and the Louisiana Department of

Environmental Quality against Mosaic relating to Mosaic's facilities in Louisiana.  The filing or

pendency of an appeal of the Court's entry of this Consent Decree shall not stay the Effective

Date, except as may be otherwise determined pursuant to Paragraph 93 (Modification).

      In the event that either Consent Decree is not entered by the Court, the Parties shall

jointly stipulate to stay any previously entered Consent Decree.  Notwithstanding the foregoing,

Mosaic hereby agrees that it shall be bound from the date of its execution of this Consent Decree

to perform obligations scheduled in this Consent Decree to occur prior to the Effective Date.

## XVII.  RETENTION OF JURISDICTION

      92.    The Court shall retain jurisdiction over this case until termination of this Consent

Decree for all Facilities, pursuant to Section XIX (Termination), for the purpose of resolving

disputes arising under this Consent Decree (including disputes under any Trust Agreements

entered pursuant hereto) or entering orders modifying this Consent Decree, pursuant to Sections

XI (Dispute Resolution) and XVIII (Modification), or effectuating or enforcing compliance with

the terms of this Consent Decree.

## XVIII.  MODIFICATION

      93.    The terms of this Consent Decree may be modified only by a subsequent written

agreement of the Parties to this Consent Decree as set forth herein.  Any modifications to the

provisions of Appendices 1 through 7 hereto, and any other modifications to any other provisions

of this Consent Decree that do not constitute a material change to this Consent Decree, may be

made without approval by the Court upon written agreement between Mosaic and the United

States, after consultation with FDEP.  Any modifications to the provisions of Appendices 8 and 9

may be made without approval by the Court upon written agreement between Mosaic and FDEP,

after consultation with the United States.  Any such changes shall become enforceable under this Consent Decree upon execution by Mosaic and the United States (for changes to the Consent Decree or Appendices 1 through 7) or Mosaic and FDEP (for changes to Appendices 8 and 9), shall be made available to the public by EPA and FDEP (except to the extent such changes contain information determined to be CBI pursuant to Paragraph 77 and 40 C.F.R. Part 2,) and shall periodically be filed by EPA or FDEP with the Court.  Any other modifications agreed to by the Parties shall be effective only upon approval by the Court.  Except as otherwise provided in this Paragraph and Paragraph 95, a Party's refusal to agree to a modification of this Consent Decree shall be subject to dispute resolution, but a Party seeking judicial review of such a refusal shall bear the burden of demonstrating that it is entitled to the requested modification based on a significant change in factual conditions or the law or other reason that would make inequitable the continued application of the Consent Decree without the modification sought.

94.     In the event that a potential transferee under Section II of this Consent Decree has agreed to become a party to this Consent Decree and subject to all its terms and provisions, it may do so upon written approval of the United States pursuant to Section II (Applicability) of this Consent Decree and Section XVIII (Modification), without further order from the Court, in which event a supplemental signature page will be affixed to this Consent Decree and filed with the Court.

## XIX. TERMINATION

95.     <u>Periodic Review of Work Status</u>.  At least once every three (3) years, and more often if the Parties so agree, the Parties shall meet to review the status of the Work and to evaluate whether discrete portions of the Work have either been completed or may be accomplished and supervised under an EPA or FDEP administrative order or permit in lieu of

this Consent Decree.  If all Parties agree to such a modification, such agreement shall be memorialized in a written modification to this Consent Decree pursuant to Section XVIII (Modification) and shall not require judicial approval.  If the Parties agree that such modifications allow this Consent Decree to be terminated as to one or more Facilities, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree for the relevant Facilities.  The Parties' inability to reach agreement under this Paragraph shall not be subject to dispute resolution or judicial review.

96.     Completion of Work.  Within ninety (90) Days after Mosaic concludes that all Work required under this Consent Decree has been fully performed at a Facility, EPA and/or FDEP may conduct an inspection of the Facility to be attended by Mosaic, and EPA and/or FDEP at a mutually agreeable time.  Following the inspection, and correction of any problems or deficiencies noted by EPA, after consultation with FDEP, Mosaic shall submit one or more written reports by a third-party registered professional engineer in the relevant technical field, certifying compliance with Section V (Compliance Requirements) of this Consent Decree that the Work has been completed in full satisfaction of the requirements of this Consent Decree. The reports shall indicate the case name and civil action number, and shall be submitted, together with a request for Acknowledgment of Completion, in accordance with Section VIII (Reporting Requirements) of this Consent Decree.  Third-party engineer certification of any of the written reports may be waived at EPA's discretion, after consultation with FDEP.

97.     If, after review of the written report(s) and certification and consultation with FDEP, EPA determines that any portion of the Work has not been completed in accordance with this Consent Decree, EPA will notify Mosaic in writing of the activity(ies) and/or obligation(s) that must be undertaken to complete the Work.  Without prejudice to the United  States' right to

enforce this Consent Decree or assess penalties for Defendant's failure to complete any portion of the Work in accordance with this Consent Decree, EPA will set forth in the notice a schedule for performance of the activity(ies) and/or obligation(s) required under the Consent Decree, or will require Mosaic to submit a schedule for EPA approval pursuant to Section V (Compliance Requirements) of this Consent Decree.  Mosaic shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to Mosaic's right to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution) of this Consent Decree.

98.     If EPA concludes, based on the initial or any subsequent request for an Acknowledgment of Completion by Mosaic, and after reasonable opportunity for review and comment by FDEP, that the Work has been fully performed in accordance with this Consent Decree, EPA will so notify Mosaic in writing, which notice shall constitute the Acknowledgment of Completion.

99.     Termination.  After Mosaic has completed the requirements set forth in Paragraphs 96 and 97 of this Section, has obtained an Acknowledgment of Completion, has complied with all other requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Mosaic may serve upon the United States and FDEP a Request for Termination, stating that Mosaic has satisfied those requirements, together with all necessary supporting documentation.  A Request for Termination may address one or more of Mosaic's Facilities.

100.     Following receipt by the United States and FDEP of Mosaic's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Mosaic has satisfactorily complied with the requirements

for termination of this Consent Decree.  If the United States, after consultation with FDEP, agrees that the Consent Decree may be terminated for one or more Facilities, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree as to the relevant Facilities.

101.    If the United States, after consultation with FDEP, does not agree that the Consent Decree may be terminated as to one or more Facilities, Mosaic may invoke Dispute Resolution under Section XI of this Consent Decree.  However, all time periods and deadlines established under Section XI (Dispute Resolution) shall be extended by sixty (60) Days, or more by the agreement of the Parties.

## XX.  PUBLIC PARTICIPATION

102.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Mosaic and The Mosaic Company consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified Mosaic in writing that it no longer supports entry of the Consent Decree.

## XXI.  SIGNATORIES/SERVICE

103.    Each undersigned representative of Mosaic and The Mosaic Company, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, or his designee, and the Secretary of the Florida Department of Environmental Protection certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

104.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Mosaic and The Mosaic Company agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXII.  INTEGRATION

105.    This Consent Decree and its Appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than the Appendices, which are attached to and incorporated in this Consent Decree, and the Referenced Documents, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.  The "Referenced Documents" are the following documents which are referenced in the Consent Decree:  (1) Mosaic's consolidated waste management practices submittal dated September 8, 2015 (Paragraph 15(b) and 16(b)); and

(2) Overview of Seepage Control Features and Projected Groundwater Quality Impacts for Mosaic Fertilizer, LLC Bartow Phosphogypsum Stack System, (dated January 10, 2011 (Appendix 7, A. Mosaic Bartow)) and for the New Wales Phosphogypsum Stack System (dated August 16, 2010, May 27, 2011 and November 7, 2011 (Appendix 7, B. Mosaic New Wales)).

## XXIII.  FINAL JUDGMENT

106.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, FDEP, Mosaic and The Mosaic Company.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXIV.  APPENDICES

107.    The following Appendices are attached to and part of this Consent Decree:

Appendix 1 contains the following compliance requirements:

Attachment A (Site Assessment, Reporting, and Corrective Action);

Attachment B (Groundwater and Zone of Discharge Requirements);

Attachment C (Phosphogypsum Stack System Construction and Operational Requirements);

Attachment D (Closure of Phosphogypsum Stacks/Stack Systems);

Attachment E (Critical Conditions and Temporary Measures);

Attachment F (Definitions for Purpose of the Consent Decree);

Attachment G (Phosphogypsum Stack System Permanent Closure Application)

Appendix 2 establishes Financial Assurance Requirements;

Attachment A (CFO Certification);

Attachment B (Phosphogypsum Stack System Closure and Long Term Care Cost Estimate);

Attachment C (Summary Annual Costs for Phosphogypsum Stack System Closure and Long Term Care);

Attachment D (Financial Mechanisms: Trust Agreement Form, Trust Agreement Addendum Form, Corporate Guarantee form, Corporate Financial Test form; Letter of Credit form);

Attachment E (Type B Financial Metrics Chart);

Attachment F (Current Configuration of Operating Facilities' Phosphogypsum Stack System and Planned Expansions);

Attachment G (Summary of Phosphogypsum Stack Volumes and Closure Areas);

Attachment H (Guarantor's Representation and Certification form); and

Attachment I (Executed Corporate Guarantee for Phosphogypsum Stack System Closure and Long Term Care).

Appendix 3 is the collected Site Maps of the Mosaic Facilities;

Appendix 4 is the collected Facility Reports;

Appendix 5 is Mosaic's current BMP Plan;

Appendix 6 is the RCRA Project Narrative and Compliance Schedule;

Appendix 7 is the Alternative Liner Requirements;

Appendix 8 shows the Zones of Discharge for the Bartow, New Wales, and Riverview Facilities;

Appendix 9 contains the SEP requirements.

SIGNATURE PAGE IS THE NEXT PAGE

Dated and entered this 5ᵗʰ day of AUGUST , 2016.

_____

UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF FLORIDA

FOR THE UNITED STATES OF AMERICA:


Date: 9/29/15


JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530


Date: 9/30/15


DEBORAH M. REYHER
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044
(202) 514-4113

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic Fertilizer, LLC</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

Date: Sept 29, 2015

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C.  20460

- 78 -

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic Fertilizer, LLC</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

Date: 9/28/15

MARY J. WILKES
Regional Counsel and Director
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960

Date: 9/28/15

JOAN REDLEAF DURBIN
Senior Attorney
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic Fertilizer, LLC</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR PLAINTIFF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION:

Date: 9/29/15

PAULA L. COBB
Deputy Secretary for Regulatory Programs
Florida Department of Environmental Protection
3900 Commonwealth Blvd., M.S. 15
Tallahassee, Florida 32399

- 80 -

Mosaic Consent Decree – EPA Region 4 and FDEP
FOR MOSAIC FERTILIZER, LLC:

Date: _____

Mark Isaacson
Senior Vice President and Corporate Secretary
Mosaic Fertilizer, LLC

- 81 -

Mosaic Consent Decree – EPA Region 4 and FDEP

FOR THE MOSAIC COMPANY (as to Sections I (Jurisdiction and Venue), II (Applicability), XI (Dispute Resolution), XIII (Effect of Settlement), XV (Notices), XVI (Effective Date), XVII (Retention of Jurisdiction), XVIII (Modification), XX (Public Participation), XXI (Signatories/Service), XXII (Integration), XXIII (Final Judgment), and Paragraphs 25 and 26 (Financial Assurance)):

Date: _____